**WHOLE COURT**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
http://www.gaappeals.us/rules/

**July 16, 2014**

# In the Court of Appeals of Georgia

A14A0215. GEORGIA RIVER NETWORK et al. v. TURNER et al.

A14A0272. GEORGIA RIVER NETWORK et al. v. GRADY COUNTY BOARD OF COMMISSIONERS et al.

A14A0273. TURNER v. GRADY COUNTY BOARD OF COMMISSIONERS et al.

A14A0274. GRADY COUNTY BOARD OF COMMISSIONERS et al. v. GEORGIA RIVER NETWORK et al.

MCFADDEN, Judge.

These appeals and cross-appeals arise from a petition for administrative hearing Georgia River Network and American Rivers (the "River Groups") filed to challenge a buffer variance the Director of the Environmental Protection Division ("EPD") of the Georgia Department of Natural Resources ("DNR") (the "Director") issued to the Grady County Board of Commissioners (the "County") under Georgia's Erosion and

Sedimentation Act in connection with the County's plans to construct a 960-acre fishing lake. The buffer variance permits the County to encroach upon the 25-foot vegetative buffer the Erosion and Sedimentation Act requires adjacent to streams on the site. The Administrative Law Judge ("ALJ"), after rejecting two challenges to her jurisdiction, reversed the variance, concluding that it failed to account for buffers required for wetlands on the site. In parallel proceedings for judicial review, the Superior Court of Fulton County (the "Fulton Court") and the Superior Court of Grady County (the "Grady Court") (collectively, the "Superior Courts") issued orders reversing the ALJ's decision.

In Case Nos. A14A0215 and A14A0272, the River Groups appeal from the Fulton Court and Grady Court orders, respectively, arguing that the Superior Courts erred in finding that the ALJ lacked jurisdiction and in concluding as to the merits that the Erosion and Sedimentation Act requires a 25-foot buffer only along the banks of state waters with vegetation wrested by normal stream flow or wave action. In Case Nos. A14A0273 and A14A0274, the Director and County, respectively, cross-appeal the Grady Court order. Although they do not contest the reversal of the ALJ decision, they argue that the Grady Court erred by finding "no obvious error" in the ALJ's standing determination.

2

We conclude that the River Groups challenged an "order or action" of the Director; that the River Groups had standing; and that the Superior Courts erred in determining that the buffer requirement applies only to state waters with wrested vegetation. We therefore reverse the superior courts' judgments.

1.    *Statutory background and procedural history.*

This Court conducts a de novo review of claimed errors of law in a superior court's appellate review of an ALJ's decision. *Upper Chattahoochee Riverkeeper v. Forsyth County*, 318 Ga. App. 499, 501-502 (734 SE2d 242) (2012).

We begin with an overview of the statutory background and a discussion of the procedural history in these cases. The purpose of the Erosion and Sedimentation Act is set out as follows:

> It is found that soil erosion and sediment deposition onto lands and into waters within the watersheds of this state are occurring as a result of widespread failure to apply proper soil erosion and sedimentation control practices in land clearing, soil movement, and construction activities and that such erosion and sediment deposition result in pollution of state waters and damage to domestic, agricultural, recreational, fish and wildlife, and other resource uses. It is therefore declared to be the policy of this state and the intent of this chapter to strengthen and extend the present erosion and sediment control activities and programs of this state and to provide for the establishment and

3

implementation of a state-wide comprehensive soil erosion and sediment control program to conserve and protect the land, water, air, and other resources of this state.

OCGA § 12-7-2. The Erosion and Sedimentation Act provides that land-disturbing activities must conform with "best management practices." OCGA § 12-7-6 (b). One of these practices is set forth in OCGA § 12-7-6 (b) (15), which states that "[t]here is established a 25[-]foot buffer along the banks of all state waters, as measured horizontally from the point where vegetation has been wrested by normal stream flow or wave action" unless one of six exceptions applies, including "[w]here the director determines to allow a variance that is at least as protective of natural resources and the environment." No land-disturbing activities may be conducted within a buffer "except as otherwise provided by this paragraph." OCGA § 12-7-6 (b) (15) (B). "State waters" include

> any and all rivers, streams, creeks, branches, lakes, reservoirs, ponds, drainage systems, springs, wells, and other bodies of surface or subsurface water, natural or artificial, lying within or forming a part of the boundaries of the state, which are not entirely confined and retained completely upon the property of a single individual, partnership, or corporation.

OCGA § 12-7-3 (16).

On May 28, 2010, the U. S. Army Corps of Engineers issued a permit to the County pursuant to Section 404 of the Federal Clean Water Act, authorizing construction of a 960-acre fishing lake. The permit allows the County to impound Tired Creek, a tributary of the Upper Ochlockonee River, by constructing a 3,000-foot long, 65-foot tall, and 450-foot wide dam. The construction of the dam and lake will destroy at least 129 acres of wetlands and over nine miles of streams.

The County also needed a buffer variance to proceed with its project. On April 30, 2012, the County submitted a revised application to the EPD for a buffer variance to permit the disturbance and loss of stream buffers at the site. In comments to the EPD, the River Groups maintained that the County's application was deficient because it did not address impacts to buffers along wetlands on the site. The River Groups asserted that wetlands are "state waters" protected by buffers and that impacts to wetlands on the site would require a buffer variance and appropriate mitigation. On July 6, 2012, the Director granted the County's application for a variance. The EPD's Nonpoint Source Program Manager thereafter sent a letter to the River Groups in which he agreed that wetlands are state waters but asserted that "[w]etlands are features that usually do not require a buffer due to the lack of 'wrested vegetation.' Therefore, those impacts are not included in the buffer variance request."

5

The River Groups then filed a petition for hearing in the Office of State Administrative Hearings against the Director seeking to invalidate the County's buffer variance on the ground that it failed to account for and authorize impacts to wetlands. The County was permitted to intervene. The Director filed a motion to dismiss, later adopted by the County, asserting that the River Groups failed to identify an "order or action" they were challenging within the meaning of OCGA § 12-2-2 (c) (2) (A). The County filed a motion to dismiss, asserting that River Groups lacked standing under OCGA § 12-2-2 (c) (2) (A) because they were not aggrieved or adversely affected by the variance. The River Groups and the County filed cross-motions for summary determination. In his response to the River Groups' motion for summary determination, the Director argued that the River Groups were not aggrieved or adversely affected by the variance.

The ALJ entered an order denying the motions to dismiss; granting the River Groups' motion for summary determination; and reversing the buffer variance. The ALJ concluded that "applying the plain and unambiguous meaning of the statute, a buffer is required for all state waters, including wetlands." The Director filed a petition for judicial review in the Fulton Court, and the County filed a petition for

6

judicial review in the Grady Court. The County was permitted to intervene in the Fulton Court, and the Director was permitted to submit briefs in the Grady Court.

The Fulton Court reversed the ALJ's decision, concluding that the River Groups failed to challenge an "order or action" of the Director; the River Groups lacked standing; and the Director's application of the Erosion and Sedimentation Act was consistent with its plain terms. The Grady Court subsequently entered an order reaching the same conclusions and reversing the ALJ's decision, except that it found "no obvious error" in the ALJ's conclusion as to standing. We granted the River Groups' applications for discretionary appeal from the Superior Courts' orders, and these appeals and cross-appeals followed.

2. *Jurisdiction.*

We first address the River Groups' enumerations of error pertaining to the ALJ's subject matter jurisdiction because if subject matter jurisdiction was lacking, neither the ALJ nor the Superior Courts were authorized to enter a judgment on the merits. See *First Christ Holiness Church v. Owens Temple First Christ Holiness Church*, 282 Ga. 883, 885 (655 SE2d 605) (2008).

(a) *"Order or action."*

7

The River Groups contend that the Superior Courts erred in concluding that the ALJ lacked jurisdiction over their petition because the petition challenged the Director's alleged failure to act, not an "order or action" of the Director. We conclude that the Superior Courts erred in reversing the ALJ on this issue.

The Erosion and Sedimentation Act provides that "[a]ll hearings on and review of contested matters, orders, or permits issued by or filed against the director . . . shall be provided and conducted in accordance with subsection (c) of Code Section 12-2-2." OCGA § 12-7-16. In turn, OCGA § 12-2-2 (c) (2) (A) provides in relevant part:

> Any person who is aggrieved or adversely affected by any order or action of the director shall, upon petition to the director within 30 days after the issuance of such order or the taking of such action, have a right to a hearing before an administrative law judge.

As the ALJ concluded, the River Groups' petition challenged a specific action, the Director's issuance of a variance. The petition asserts that the variance is invalid and in violation of the Erosion and Sedimentation Act because the Director allowed the County to submit an application that failed to address alleged wetland buffers at the site and subsequently issued a variance failing to account for those buffers. At bottom, the River Groups are challenging the validity of the variance on the theory that both the application and the Director's consideration of it were incomplete. The

8

River Groups' challenge to the variance is akin to the permit challenges in other environmental cases we have entertained that were likewise based in whole or in part on the regulating authority's alleged incomplete consideration or regulation of a proposed project. See *Longleaf Energy Assoc., LLC v. Friends of the Chattahoochee*, 298 Ga. App. 753, 756-760 (2) (681 SE2d 203) (2009) (considering and rejecting claim that EPD permit for construction of coal-fired electric plant was invalid because it failed to limit carbon dioxide gas emissions); *Coastal Marshlands Protection Committee v. Center for a Sustainable Coast*, 286 Ga. App. 518, 521-529 (2) (649 SE2d 619) (2007), aff'd 284 Ga. 736 (670 SE2d 429) (2008) (considering and rejecting petitioners' claim that permit authorizing construction of marina and dock facilities over coastal marshlands was invalid because it failed to regulate permittee's adjoining upland development).

The Superior Courts reasoned that the River Groups were challenging the Director's inaction because the Director had no duty under the Erosion and Sedimentation Act to consider impacts to buffers at the site of the project if the application did not request permission to encroach on them or to require the County to address additional buffers in its application. The River Groups' petition cited to and relied upon the regulation setting forth the buffer variance process, which, in fact,

9

contemplates that a variance application will address all of the buffer impacts associated with a proposed project.[1] Further, the County conceded before the ALJ that during the buffer variance application process, the Director required it to revise its application to increase the number of linear feet of streams and associated buffers that would be impacted by the project. While the parties may dispute whether the buffer provision in the Erosion and Sedimentation Act and the variance regulation apply to wetlands, those issues relate to the merits of the River Groups' petition. Meritorious or not, the petition invoked the ALJ's jurisdiction to review the "orders or actions" of the Director.

(b) *Standing.*

The River Groups argue that the Fulton Court erred in concluding that the River Groups lacked standing because their members are not aggrieved or adversely affected within the meaning of OCGA § 12-2-2 (c) (2) (A). Conversely, the Director

---

[1] For example, the regulation states that a variance application must include a "[s]ite map that includes locations of all state waters, wetlands, floodplain boundaries and other natural features, as determined by field survey," a "[d]escription of the project, with details of the buffer disturbance, including estimated length of time for the disturbance and justification for why the disturbance is necessary," and "[c]alculation of the total area and length of the buffer disturbance." Ga. Comp. R. & Regs. r. 391-3-7-.05 (3) (a), (d), (e). Further, in reviewing a variance application, the Director must consider, inter alia, the "[l]ocation and extent of buffer intrusion." Ga. Comp. R. & Regs. r. 391-3-7-.05 (5) (c).

and the County argue that the Grady Court erred in failing to reverse the ALJ's conclusion that the River Groups had standing.

OCGA § 12-2-2 (c) (3) (A) explains that "[p]ersons are 'aggrieved or adversely affected,' [for purposes of OCGA § 12-2-2 (c) (2) (A)] . . . where the challenged action has caused or will cause them injury in fact and where the injury is to an interest within the zone of interests to be protected or regulated by the statutes that the director is empowered to administer and enforce."

We look to U. S. Supreme Court precedent concerning Article III standing for guidance in analyzing the River Groups' standing under OCGA § 12-2-2 (c) (2) (A) and (c) (3) (A). See *Center for a Sustainable Coast v. Turner*, 324 Ga. App. 762, 764 (751 SE2d 555) (2013). The U. S. Supreme Court has explained that

> to satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief

11

requested requires the participation of individual members in the lawsuit.

(Citations and punctuation omitted.) *Friends of the Earth v. Laidlaw Environmental Svcs. (TOC)*, 528 U. S. 167, 180-181 (II) (A) (120 SCt 693, 145 LE2d 610) (2000). "Environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." (Citation and punctuation omitted.) *Turner*, supra, 324 Ga. App. 765. The issues in dispute here are whether the River Groups can show that their members' alleged injuries are fairly traceable to the buffer variance and redressable in this action.

In his response to the River Groups' motion for summary determination, the Director requested that the ALJ make a determination on the issue of standing in accordance with OCGA § 12-2-2 (c) (3) (A) , which states:

> In the event the director asserts in response to the petition before the administrative law judge that the petitioner is not aggrieved or adversely affected, the administrative law judge shall take evidence and hear arguments on this issue and thereafter make a ruling on this issue before continuing with the hearing. The burden of going forward with evidence on this issue shall rest with the petitioner.

The statute contemplates an evidentiary hearing on the issue of standing. See *Smart Growth – Forsyth County v. Couch*, Docket No. OSAH-BNR-ES-0707202-60-Howells, Order on Standing, March 2, 2007, 2007 WL 828306, at *2 (ALJ conducted hearing on standing and heard testimony from petitioners' witnesses).[2] During oral argument on the parties' motions, the Director's counsel, rather than requesting that an evidentiary hearing take place, stated that because the Director had invoked OCGA § 12-2-2 (c) (3) (A), the River Groups were required to come forward with evidence to establish causation in support of their motion for summary determination. The Director's counsel argued that the River Groups failed to do so. The River Groups, however, already had presented evidence relevant to standing, as they attached several affidavits to their petition, including affidavits from two individuals who are members of both organizations and live in close proximity to the proposed lake. Neither the Director nor the County disputed the veracity of these affidavits. Thus,

___

[2] We disagree with the Director to the extent he argues that a petitioner must establish standing at such a hearing with "undisputed credible evidence." See *Board of Regents &c. v. Oglesby*, 264 Ga. App. 602, 605 (1) (591 SE2d 417) (2003) (when trial court makes determinations of fact when ruling on motion to dismiss on jurisdictional grounds, "[i]ts evaluation rests on where the preponderance of evidence lies, not necessarily on whether the issue may be decided as a matter of law.") (citations and punctuation omitted).

the issue before the ALJ was whether those affidavits are legally sufficient to establish the individuals' standing.[3] We conclude that they are.

One of the affiants stated that she has enjoyed walking along Tired Creek and its tributaries, has canoed on the Ochlockonee River downstream from the proposed lake, and hopes to continue these activities. She believes that as a result of the buffer variance, the waters downstream will be less desirable for viewing, recreation, and other uses. The other affiant stated that she enjoys walking along the waters downstream from the site and is afraid that the destruction of the buffers will negatively impact the water quality downstream. She is also concerned the variance will negatively impact migratory birds and destroy trails animals use when seeking food and water. The affiants stated that their use and enjoyment of waters on the site and downstream has been and will continue to be significantly and negatively affected by the variance.

To establish standing, the River Groups must show that the injuries described by the members are "fairly traceable to the challenged action of the defendant, and

---

[3] Since the parties acquiesced in the ALJ deciding the issue of standing based on the member affidavits, we conclude that any error in failing to hold an evidentiary hearing was waived. See *Davis v. Phoebe Putney Health Systems*, 280 Ga. App. 505, 506 (1) (634 SE2d 452) (2006).

not the result of the independent action of some third party not before the court." (Citation omitted.) *Bennett v. Spear*, 520 U. S. 154, 167 (III) (A) (117 SCt 1154, 137 LE2d 281) (1997). Here, it is undisputed that the buffers required by the Erosion and Sedimentation Act at the site could not be disturbed and the lake project could not go forward without both the Section 404 permit and the buffer variance. As such, even if the Section 404 permit is also a cause of the damage to and loss of alleged wetland buffers, the loss is nonetheless fairly traceable to the buffer variance. See *Mattaponi Indian Tribe v. Commonwealth, Dept. of Environmental Quality*, 261 Va. 366, 375-378 (541 SE2d 920) (2001) (petitioners had standing to challenge state permit authorizing reservoir for public water supply although project also would require federal Section 404 permit; state permit protected separate interests and could cause injury). In concluding that the River Groups failed to establish that the buffer variance, rather than the Section 404 permit, caused their members' injuries, the Fulton Court relied on OCGA § 12-7-6 (b) (15) (C) (i), which requires that the Board of Natural Resources adopt rules with specific criteria for the grant or denial of a variance and states that the

rules shall provide, at a minimum, that the director shall consider granting a variance in the following circumstances: (i) Where a

15

proposed land-disturbing activity within the buffer would require the landowner to acquire a [Section 404] permit, . . . and the Corps of Engineers has approved a mitigation plan to be implemented as a condition of such a permit.

The applicable regulation allows a variance in this circumstance. Ga. Comp. R. & Regs. r. 391-3-7-.05 (2) (h). While the statute and regulation establish that a variance may be available when a Section 404 permit has been issued and is subject to a mitigation plan, a variance is not a foregone conclusion. Rather, a detailed application is still required, and the Director must consider various factors in deciding whether to grant it. See Ga. Comp. R. & Regs. r. 391-3-7-.05 (3)-(5).

We also disagree with the Fulton Court's conclusion that the permanent loss of wetland buffers due to flooding would be inconsequential since the wetlands they protect will be destroyed by flooding. It is undisputed that the County was required to apply for a buffer variance in connection with the inundation and permanent loss of streams and their buffers at the lake site. That the County was required to do so is evidence that permanent buffer loss in connection with a project like the County's implicates the interests protected by the Erosion and Sedimentation Act.

Finally, we reject the County's argument that the River Groups cannot establish redressability. The County's reliance on our decision in *Turner*, supra, is unavailing.

16

In that case, an environmental group challenged a consent order the Director entered into with a property owner after discovering that the property owner had constructed a bulkhead in a salt water marsh area without first requesting a buffer variance. 324 Ga. App. at 762-763. We held that the environmental group could not establish that the relief requested would redress its injuries. Id. at 768. We reasoned that if the ALJ issued an order invalidating the consent order, the bulkhead would remain in place. Id. We also concluded that the ALJ could not require the Director to order removal of the bulkhead because such a requirement would amount to improper interference with an agency's exercise of its discretionary enforcement authority. Id. The relief requested here, reversal or invalidation of the variance, does not implicate the Director's enforcement authority. Further, an ALJ possesses authority to reverse the Director's decision on a variance application if the decision does not comport with the requirements of the Erosion and Sedimentation Act and the variance regulation. See *The Sembler Company v. Environmental Protection Div., Dept. of Natural Resources,* Docket No. OSAH-DNR-ES-02-04135060-SEP, Final Decision, March 18, 2002, 2002 WL 34125519 (reversing denial of buffer variance application).

For these reasons, we reject the Director's and County's arguments that the Grady Court erred by failing to reject the ALJ's determination that the River Group's had standing.

2. *Buffer requirement.*

Finally, the River Groups contend that the Superior Courts erred in concluding that under the plain statutory language, buffers exist only along the banks of state waters[4] where vegetation has been wrested by normal stream flow or wave action. We agree.

As this case involves a matter of statutory construction, we must "look diligently for the intention of the General Assembly and . . . follow the literal language of the statute unless it produces contradiction, absurdity, or such an inconvenience as to insure that the legislature meant something else." *Judicial Council of Georgia v. Brown & Gallo*, 288 Ga. 294, 296-297 (702 SE2d 894) (2010) (citation and punctuation omitted). See also OCGA § 1-3-1 (a). With these principles in mind, we conclude that the Superior Courts erred by determining that the 25-foot

---

[4] The parties do not dispute that wetlands fall within the definition of "state waters" in the Erosion and Sedimentation Act. Various professional organizations and trade groups, however, have submitted an amicus brief arguing that wetlands are not "state waters." This issue has not been fully litigated, and we need not and do not reach it here.

18

buffer requirement of the Erosion and Sedimentation Act does not apply unless the state waters at issue have banks with wrested vegetation.

As detailed above, OCGA § 12-7-6 (b) (15) (A), which is set out in the margin,[5] establishes "a 25[-] foot buffer along the banks of all state waters." "State

[5] "There is established a 25[-]foot buffer along the banks of all state waters, as measured horizontally from the point where vegetation has been wrested by normal stream flow or wave action, except:

(i) As provided by paragraph (16) of this subsection;

(ii) Where the director determines to allow a variance that is at least as protective of natural resources and the environment;

(iii) Where otherwise allowed by the director pursuant to Code Section 12-2-8;

(iv) Where a drainage structure or a roadway drainage structure must be constructed, provided that adequate erosion control measures are incorporated in the project plans and specifications and are implemented;

(v) Along any ephemeral stream. As used in this division, the term "ephemeral stream" means a stream:

    (I) That under normal circumstances has water flowing only during and for a short duration after precipitation events;

    (II) That has the channel located above the ground-water table year round;

    (III) For which ground water is not a source of water; and

    (IV) For which runoff from precipitation is the primary source of water flow; or

20

waters" is a defined term, and the definition is broad. "State waters" includes

> any and all rivers, streams, creeks, branches, lakes, reservoirs, ponds, drainage systems, springs, wells, and other bodies of surface or subsurface water, natural or artificial, lying within or forming a part of the boundaries of the state, which are not entirely confined and retained completely upon the property of a single individual, partnership, or corporation.

OCGA § 12-7-3 (16). That broad definition of "state waters" is narrowed, for purposes of the applicability of the 25-foot buffer requirement in OCGA § 12-7-6 (b) (15) (A), by six statutory exceptions not applicable here; the requirement otherwise applies to "all state waters." One of these exceptions is for a category of waters to which the General Assembly deemed a buffer inappropriate (ephemeral streams). OCGA § 12–6 (b) (15) (A) (v). Two others give the Director limited discretion to grant variances. OCGA § 12-7-6 (b) (15) (A) (ii), (iii). In a subordinate clause, the

---

(vi) Where shoreline stabilization is installed; provided, however, that this exception shall be limited to the construction of bulkheads and sea walls only to the extent required to prevent the erosion of the shoreline. This exception shall be limited to Lake Oconee and Lake Sinclair and shall be limited to the duration of such construction.

Unless exempted under division (v) of this subparagraph, buffers of at least 25 feet established pursuant to Part 6 of Article 5 of Chapter 5 of this title shall remain in force unless a variance is granted by the director as provided in this paragraph.

statute goes on to direct that the buffer is to be "measured horizontally from the point where vegetation has been wrested by normal stream flow or wave action." The question before us is whether that direction entails a seventh exception.

We hold that it does not. It merely specifies the location of the buffer – alongside the "bank" or the "margin of the watercourse," Webster's New International Dictionary (1954) – and a method for measuring it. To treat that language as a seventh exception, as the Superior Courts did, would be to hold that no buffer is required along the banks of streams, rivers, and lakes that have rocky or sandy shores where lines of wrested vegetation cannot be found. This interpretation would hold that buffer protection is afforded in fits and starts, should the line of wrested vegetation not be continuous, an absurdity not intended by the legislature. See *Judicial Council of Georgia*, supra, 288 Ga. at 296-297.

The wrested vegetation measurement language was added to the statute in 1994. Formerly, the statute had provided that the buffer was "measured from the stream banks." In 1994, the General Assembly amended that language to provide that the buffer was measured "from the point where vegetation has been wrested." The 1994 version of the statute listed three exceptions to the buffer requirement. Had the General Assembly intended to except state waters without wrested vegetation from

22

the buffer requirement, it would have said so expressly in the list of exceptions, not by implication in a subordinate clause that addresses measurements.

The statute is internally inconsistent. As the dissent says, it does not set out an alternative to its provision that buffers are to be measured from wrested vegetation. On the other hand it sets out explicitly the six exceptions to the rule establishing a buffer along the banks of all state waters – each narrower than the purported exception for state waters without wrested vegetation. It is our duty to resolve that inconsistency so as to give effect to the intent of the General Assembly and to avoid absurd results.

Here the General Assembly stated its intent: "to strengthen and extend the present erosion and sediment control activities and programs of this state" and "to protect the land, water, air, and other resources of this state." OCGA § 12-7-2. See also Mark McCarty et al., Peach Sheets: *Conservation and Natural Resources*, 12 Ga. St. U. L. Rev. 39, 47 (1995) (reporting on another change made to the Erosion and Sedimentation Act the year after the "wrested vegetation" language was adopted: "The Senate committee substitute made a blanket change of terms from 'streams' to 'waters,' and this change was ultimately adopted in the Act. Environmental lobbyists and the EPD encouraged this change to broaden the scope of regulation to waters that

23

do not flow, such as lakes and marshlands.") (footnotes omitted). The Superior Courts erred in construing the statute in a manner contrary to the General Assembly's stated intent.

*Judgments reversed. Barnes, P. J., Doyle, P. J., and Boggs, J., concur; Andrews, P. J., Ray and Branch, JJ., dissent.*

A14A0215. GEORGIA RIVER NETWORK et al. v. TURNER et al.

A14A0272. GEORGIA RIVER NETWORK et al. v. GRADY COUNTY BOARD OF COMMISSIONERS et al.

A14A0273. TURNER v. GRADY COUNTY BOARD OF COMMISSIONERS et al.

A14A0274. GRADY COUNTY BOARD OF COMMISSIONERS et al. v. GEORGIA RIVER NETWORK et al.

ANDREWS, Presiding Judge, concurring in part and dissenting in part.

I concur fully in Division 1 of the majority's opinion. I respectfully dissent from Division 2, however. The majority's interpretation of OCGA § 12-7-6 (b) (15) (A) (the "buffer provision") rewrites that statutory provision, and its assertion that doing so is necessary to effectuate the General Assembly's intent and to avoid an unreasonable result is conclusory and speculative.

In cases involving questions of statutory interpretation, we are guided by the following principles:

> It is elementary that in all interpretations of statutes, the courts shall look diligently for the intention of the General Assembly. In so doing, the ordinary signification shall be applied to all words. Where the language of a statute is plain and susceptible to only one natural and reasonable construction, courts must construe the statute accordingly. . . . Moreover, Georgia law provides that the express mention of one thing in an act or statute implies the exclusion of all other things.

(Footnotes and punctuation omitted.) *Chase v. State*, 285 Ga. 693, 695 (2) (681 SE2d 116) (2009).

In relevant part, OCGA § 12-7-6 (b) (15) (A) states that "[t]here is established a 25-foot buffer along the banks of all state waters, as measured horizontally from the point where vegetation has been wrested by normal stream flow or wave action, except" when one of six exceptions applies. The wrested vegetation phrase, set off by commas between "state waters" and "except," is a participial phrase that modifies the term "buffer." The wrested vegetation phrase directs that the 25-foot buffer along the banks of state waters is "measured horizontally from the point where vegetation

2

has been wrested by normal stream flow or wave action." OCGA § 12-7-6 (b) (15) (A). Applying its ordinary meaning, "wrest" means "[t]o extract by or as if by force, twisting, or persistent effort." The American Heritage Dictionary of the English Language at 2060 (3d ed. 1992). When normal stream flow or wave action is absent or lacks sufficient force to wrest the vegetation along the banks of state waters, the E&S Act provides no means of measuring a buffer. I would hold that the most natural and reasonable construction of the buffer provision is that under such circumstances, no buffer exists. This interpretation is reinforced by the buffer provision's description of buffers as located along the "banks" of state waters. When used in reference to a body of water, "bank" most commonly means "the rising ground bordering a lake, river, or sea," Merriam Webster's Collegiate Dictionary at 96 (11th ed. 2008) or "[t]he slope of land adjoining a body of water, especially adjoining a river, lake, or channel." The American Heritage Dictionary, supra, at 145. Even if they are not in and of themselves determinative of the buffer provision's meaning, these definitions are evidence that the General Assembly contemplated that buffers would exist along those bodies of water, such as rivers and lakes,

3

that are characterized by water movement sufficient to create a line of wrested vegetation.

The majority agrees that wrested vegetation phrase sets forth the method for measuring the buffer yet concludes that a buffer exists adjacent to all state waters even when there is no line of wrested vegetation from which it may be measured. In reaching this conclusion, the majority is impliedly holding that other means of measuring a buffer may be used if wrested vegetation is absent. But if the General Assembly had intended that other methods of measuring a buffer could apply or that the EPD should develop them, it would have said so. The express mention of one method of measuring the buffer implies the exclusion of other methods under the principle of *expressio unius est exclusio alterius.* See *Morton v. Bell*, 264 Ga. 832, 833 (452 SE2d 103) (1995). The majority, too, relies on this principle of statutory construction, stating that the Superior Courts' interpretation of the buffer provision violates the principle by adding a new, seventh exception to the circumstances in which a buffer is required. I find this conclusion unpersuasive. A determination that state waters that do not have banks with wrested vegetation do not fall within the scope of the

4

buffer requirement in the first place is not tantamount to creating a new statutory exception.

The majority rewrites the buffer provision because it concludes that doing so is necessary to effectuate the intent of the General Assembly and to avoid unreasonable results. The majority states that under the Superior Courts' interpretation of the buffer provision, no buffer would be required "along the banks of streams, rivers, and lakes that have rocky or sandy shores where lines of wrested vegetation cannot be found" and that an absurd result would ensue if, therefore, buffer protection applied in "fits and starts." The majority does not explain, however, why it would be unreasonable for the General Assembly to conclude that a vegetative buffer is not necessary where there is no vegetation along the water banks to begin with. Nor does the majority hazard an explanation as to why the General Assembly could not have reasonably concluded that a buffer should not be required where, as may occur with wetlands, there is a continuous growth of vegetation from the upland into the waters.

The scope of the buffer provision may not be as wide as the River Groups and the majority believe it should be, but it is nonetheless broadly

5

drawn to apply to the banks of any "state waters," so long as the criteria of the wrested vegetation phrase are satisfied. The majority offers no compelling reason for concluding that the General Assembly could not have determined that a buffer along the banks of state waters with wrested vegetation together with the numerous other best management practices set forth in OCGA § 12-7-6 (b) would effectuate the purposes of the statute. While there are no doubt policy arguments in favor of a broader buffer provision, it is not our place to second-guess the General Assembly's judgment in this regard or to rewrite the buffer provision to achieve what we believe is a more desirable level of environmental protection. See *Allen v. Wright*, 282 Ga. 9, 12 (1) (644 SE2d 814) (2007) ("[U]nder our system of separation of powers this Court does not have the authority to rewrite statutes.") (citation and punctuation omitted).

I am authorized to state that Judge Ray and Judge Branch join in this dissent.

6