297 Ga. 557
FINAL COPY

S15A0366. TIBBLES v. TEACHERS RETIREMENT SYSTEM
OF GEORGIA et al.


BLACKWELL, Justice.

Following 31 years of service as a teacher in the public schools, Carol

Tibbles retired in April 1994. She is a member of the Teachers Retirement

System of Georgia, and as such, she is entitled by law to annual retirement

allowance in an amount

> equal to 2 percent of [her] average compensation over the two
> consecutive years of membership service producing the highest
> such average, multiplied by the number of [her] years of creditable
> service, not to exceed 40.

OCGA § 47-3-120 (a) (2). To calculate the amount of the allowance to which

Tibbles was entitled, the System looked to the compensation that she earned in

the 24 consecutive calendar months beginning with February 1992, and it

applied the statutory formula to that compensation. It appears that the System

consistently has paid Tibbles an allowance in an amount consistent with that

calculation.

Tibbles claims, however, that the System miscalculated the amount to which she is entitled. First, she says, the statutory reference to "two consecutive years" does not mean 24 consecutive calendar months. She argues that it instead means 730 consecutive calendar days, unless one of those days is a leap day, in which case, it means 731 consecutive calendar days. Second, Tibbles says, the statutory reference to "average compensation" refers to compensation *paid*, not compensation *earned*, in the pertinent two years. So, rather than looking to her compensation earned in the 24 consecutive calendar months beginning with February 1992, Tibbles urges, the System should have calculated her allowance based upon the compensation that she was paid from Thursday, December 5, 1991 through Friday, December 4, 1993, including the paychecks that she received on the first and last days of that period, the former of which was for her work as a teacher in November 1991.

Tibbles sued the System and its trustees, seeking legal and equitable relief for the alleged miscalculation of her annual retirement allowance. The trial court awarded summary judgment to the System, finding that the System adhered to its own rules and policies in calculating the amount to which Tibbles is entitled,

2

and concluding that those rules and policies comport with OCGA § 47-3-120 (a) (2). Tibbles appeals, and we affirm.

1. This case concerns the meaning of OCGA § 47-3-120 (a) (2), and so, we begin with the familiar and settled principles that inform our consideration of statutory meaning. "A statute draws it meaning, of course, from its text." Chan v. Ellis, 296 Ga. 838, 839 (1) (770 SE2d 851) (2015) (citation omitted). When we read the statutory text, "we must presume that the General Assembly meant what it said and said what it meant," Deal v. Coleman, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013) (citation and punctuation omitted), and so, "we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would." FDIC v. Loudermilk, 295 Ga. 579, 588 (2) (761 SE2d 332) (2014) (citation and punctuation omitted). "The common and customary usages of the words are important, but so is their context." Chan, 296 Ga. at 839 (1) (citations omitted). "For context, we may look to the other provisions of the same statute, the structure and history of the whole statute, and the other law — constitutional, statutory, and common law alike — that forms the legal background of the statutory provision in question." May v. State, 295 Ga. 388, 391-392 (761 SE2d 38) (2014) (citations omitted).

3

Even reading the statutory text in this way, we sometimes may find that the statutory text naturally and reasonably can be understood in more than one way. When such a genuine ambiguity appears, it usually is for the courts to resolve the ambiguity by ascertaining the *most* natural and reasonable understanding of the text. See State v. Mulkey, 252 Ga. 201, 202-204 (2) (312 SE2d 601) (1984). But when it appears that the General Assembly has committed the resolution of such an ambiguity to the discretion and expertise of an agency of the Executive Branch that is charged with the administration of the statute, the usual rule may not apply. In those instances, the courts must defer to the way in which the agency has resolved the ambiguity in question, so long as the agency has resolved the ambiguity in the proper exercise of its lawful discretion, and so long as the agency has resolved it upon terms that are reasonable in light of the statutory text. See Cook v. Glover, 295 Ga. 495, 500 (761 SE2d 267) (2014). See also Center for a Sustainable Coast v. Coastal Marshlands Protection Committee, 284 Ga. 736, 741 (2) (670 SE2d 429) (2008). This approach is not a new one.[1] Suttles v. Northwestern Mut. Life Ins. Co., 193

___

[1] As Professor David Shipley has explained, our Court has long adhered to this approach, even if many of our earlier cases did not acknowledge it so explicitly. See David E. Shipley, "The Chevron Two-Step in Georgia's Administrative Law," 46 Ga. L. Rev. 871,

4

Ga. 495, 515 (4) (19 SE2d 396) (1942) (noting that a "[reasonable] administrative interpretation and practice, continued for a long period, should be accepted as controlling," but "only when the law is ambiguous and susceptible of different interpretations"). It reflects an acknowledgment that the General Assembly properly may leave some matters to the discretion of the Executive Branch, see Dept. of Transp. v. City of Atlanta, 260 Ga. 699, 703 (1) (398 SE2d 567) (1990), as well as a recognition that some ambiguities may be better resolved by officers and agencies of the Executive Branch, who can weigh the policy implications of the ways in which an ambiguity reasonably might be resolved in a way that courts cannot, and who can bring to bear specialized knowledge and expertise that the courts lack. See Bentley v. Chastain, 242 Ga. 348, 350-351 (1) (249 SE2d 38) (1978). And for the most part, our approach is consistent with the approach adopted by the United States Supreme Court in Chevron, USA v. Natural Resources Defense Council, 467 U. S. 837 (104 SCt 2778, 81 LE2d 694) (1984),[2] as this Court recently acknowledged. See Cook,

_____

888-916 (III) (2012).

[2] In Chevron, the United States Supreme Court described its approach in this way:
When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question

5

295 Ga. at 500. With these principles in mind, we turn now to the questions of statutory meaning presented in this case.

2. According to OCGA § 47-3-120 (a) (2), the amount of an annual retirement allowance must be calculated with reference to "average compensation over the *two consecutive years* of membership service producing the highest such average," OCGA § 47-3-120 (a) (2) (emphasis supplied), and the parties dispute what is meant by "two consecutive years." As we noted earlier, Tibbles says that "two consecutive years" means 730 consecutive calendar days, unless one is a leap day, in which event, it means 731 consecutive

---

whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

467 U. S. at 842-843 (II) (citations and footnotes omitted).

Because our approach predates Chevron by many years, we have not adopted Chevron and its progeny as our own, and our approach may not be perfectly consistent with the Chevron approach in every respect and every application. That said, our approach does closely resemble the Chevron approach in many respects, and both approaches reflect the same sorts of concerns about judicial respect for the legislative commitment of certain questions to the discretion of the Executive Branch and the special competence of officers and agencies of the Executive Branch. For that reason, it often is useful to consult Chevron and its progeny in applying our own approach.

calendar days. For that reason, Tibbles argues, the statutory period of "two consecutive years" can commence on any day. As reflected in its own administrative rules and practices, however, the System understands the statutory reference to "two consecutive years" to mean 24 consecutive calendar months. See, e.g., Ga. Comp. R. & Regs., Rule 513-5-1-.08 ("The calculation of average salary for retirement purposes shall allow the use of the salary earned during any twenty-four (24) consecutive months producing the highest such average . . . ."); Rule 513-5-1-.14 (1) (to calculate amount to which member is entitled, "[s]elect a two-year period of twenty-four (24) consecutive months with

7

the highest salary").[3] A calendar month, of course, necessarily commences on the first day of a month named in the calendar.

(a) To begin, we consider whether the meaning of the statutory reference to "two consecutive years" is unambiguous. Standing alone, the term could be reasonably understood in more than one way. By definition, a "year" is a period of twelve consecutive months, as the System contends, and it also is a period of 365 consecutive days (or 366 days in leap years), just as Tibbles argues. In its ordinary usage, however, the term "year" — whether the "year" is measured in months or days — is susceptible of different meanings so far as the specific

---

[3] To be sure, these administrative rules do not explicitly provide that the 24 consecutive months must be *calendar* months. But according to the record, that is exactly how the System has consistently understood these rules, and indeed, the text of Rule 513-5-1-.08 admits of no other understanding. In full, Rule 513-5-1-.08 provides:

> The calculation of average salary for retirement purposes shall allow the use of the salary earned during any twenty-four (24) consecutive months producing the highest such average; *not counting any month* in which the member normally would be under contract but *for which no contributions were reported*, provided that additional months would be used only if the member did not have credit for two (2) full years of service for the twenty-four (24) month period.

(Emphasis supplied.) The statutory law makes clear that contributions are remitted on the basis of calendar months, with each school system required to remit employee contributions by the tenth calendar day of the month following the month for which the contributions were made. See OCGA § 47-3-42 (a). Because there is no reason to think that contributions would be reported on any basis other than that on which they are remitted, Rule 513-5-1-.08 must be understood to mean "calendar months" by its references to "months."

points on the calendar at which a "year" can be said to begin and end. See State ex rel. Gareau v. Stillman, 247 NE2d 461, 462 (Ohio 1969) (when used with reference to "a period of 365 days," the "word 'year' . . . is susceptible of different meanings so far as the time within which the 365-day period should begin and end"). See also Federal Trust Bank v. C. W. Matthews Contracting Co., 312 Ga. App. 200, 202 (1) & n. 8 (718 SE2d 63) (2011) (although a "month" can mean "the period from a day of one month to the corresponding day of the next month," it also can mean "one of the months as named in the calendar"). The ordinary usage of the word "year" does not resolve the question presented in this case.

As used in our statutory law, the term "year" is presumed to refer to a "calendar year," OCGA § 1-3-3 (24), unless the context in which it is used indicates otherwise. See Southerland v. Bradshaw, 255 Ga. 455, 456 (2) (339 SE2d 579) (1986). No party to this case contends that "two consecutive years" means two consecutive calendar years — that is, two years beginning on January 1 of the first year — and indeed, the context of the statutory reference suggests strongly that it means something other than calendar years. After all, OCGA § 47-3-120 (a) (2) speaks of "two consecutive years of membership service," and

9

because academic years in the public schools of Georgia traditionally have commenced in August or September, many new teachers would be expected to begin to accrue "membership service" in months other than January. Cf. Bd. of Ed. of Township of Manchester v. Raubinger, 187 A2d 614 (N.J. Super. A.D. 1963). For this reason, the presumptive statutory meaning is of no help either.

Likewise, although the statutory usage of "two consecutive years" with reference to "membership service" suggests strongly that it does not mean a calendar year, this circumstance does not, without more, definitively resolve the dispute with which we are presented. When used with reference to employment, "[t]here are [various] types of year . . . . Employment is not inherently, or even generally, associated with any specific type of year . . . ." Mallin v. Nat. City Mtg., No. 05-1499 SC, 2007 WL 4208336 at *4 (III) (B) (N.D. Cal. Nov. 27, 2007) ("year" may refer to "fiscal year, school year, tax year, lunar year, etc."). Indeed, in this case, a reasonable person might argue from the text of OCGA § 47-3-120 (a) (2) alone that "two consecutive years of membership service" could refer to two consecutive academic years (commencing on the first day of class), two consecutive teacher-contract years (commencing on the effective date of a teacher contract), or two consecutive years of service as a teacher

10

(commencing on the anniversary of the date upon which the member first began to accrue "membership service"). Of course, no party to this case suggests that OCGA § 47-3-120 (a) (2) refers to any of these sorts of years.

Nevertheless, the statutory reference to "two consecutive years" must be considered in a context broader than just the words of OCGA § 47-3-120 (a) (2). Looking to other sections of the statutory law concerning teacher retirement benefits, see <u>May</u>, 295 Ga. at 391-392, we note that the statutes require the remittance of employer and employee contributions to the System on the basis of calendar months:

> It shall be the duty of each county board of education, the board of education of each independent school system, and of each and every employer of teachers to deduct and collect the required employee contributions from each teacher's salary and to make monthly remittance of such amounts to the [System]. Each employer shall likewise make the required employer contribution and shall make monthly remittance of such amounts to the [System] along with employee contributions. Each employer shall remit the required employee and employer contributions to the [System] *by the tenth calendar day of the month following the month for which the contributions were made.* In the case of the failure or refusal of the employer to remit the employee and employer contributions on or before the tenth calendar day of the month following the month for which the contributions were made, there shall be added to the total amount of remittance due the sum of 1 ½ percent of the amount of the remittance if the failure or refusal is for not more than one month, and an additional 1 ½ percent for each additional

11

month or fraction of a month during which the failure or refusal continues.

OCGA § 47-3-42 (a) (emphasis supplied). The statutes identify the date of retirement by reference to calendar months: "The effective date of retirement will be the first of the month in which the application is received by the [System]; except that no retirement application will be effective earlier than the first of the month following the final month of the applicant's employment." OCGA § 47-3-101 (a). The statutes provide that the annual retirement allowance is payable to a retired member on a monthly basis: "All retirement allowances shall be payable in equal monthly installments . . . ." OCGA § 47-3-1 (24). And the statutes clearly contemplate that these monthly payments of the allowance are with reference to *calendar* months. See, e.g., OCGA§ 47-3-101 (c) ("Upon the death of the retired member, all monthly benefits shall cease as of the end of the month in which the retired member died.").

Especially because the statutes require the remittance of contributions and payment of allowances on the basis of calendar months, the context of OCGA § 47-3-120 (a) (2) suggests that the statute means 24 consecutive calendar months when it speaks of "two consecutive years." Indeed, a strong argument

can be made that this is the *only* natural and reasonable understanding of the statutory reference to "two consecutive years." Moreover, we find almost nothing in OCGA § 47-3-120 (a) (2) or its context to suggest that "two consecutive years" ought to be understood in terms of *days*, as opposed to calendar months or some other measure of time.[4] To the extent that the statute is unambiguous on this point, the System properly understood "two consecutive years" in its calculation of the amount of the allowance to which Tibbles is entitled.

(b) In the alternative, even if the statutory reference to "two consecutive years" were ambiguous, the way in which the System has consistently understood the term would be entitled to deference, and so, we ultimately would reach the same conclusion. Statutory ambiguity would require as the next step

---

[4] The best argument that can be made for measuring "two consecutive years" in days is the statutory direction to the System to identify "the two consecutive years of membership service *producing the highest . . . average [compensation]*." OCGA § 47-3-120 (a) (2) (emphasis supplied). Tibbles says that the direction to identify the period "producing the highest such average" defines the term "two consecutive years," and if a daily measure of "two consecutive years" would produce the highest average compensation for a particular member, then that is the  measure that the System must adopt for that member. But this statutory direction is more naturally and reasonably understood, we think, to identify *which* of the several "consecutive years of membership service" form the basis for the calculation of the amount of an allowance, not to define the unit by which "two consecutive years" ought to be measured.

13

in our analysis that we ascertain who properly ought to resolve that ambiguity.

Just as we noted earlier, a court is required to defer to an agency of the

Executive Branch with respect to the resolution of a statutory ambiguity, so long

as the legislature has committed the resolution of that ambiguity to the

discretion of the agency, the agency has resolved it by a proper exercise of that

discretion, and the agency has resolved it upon terms that are reasonable in the

light of the statutory text.

As the United States Supreme Court has explained with reference to the

Chevron doctrine:

> [A]dministrative implementation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority. Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent.

United States v. Mead Corp., 533 U. S. 218, 226-227 (I) (B) (121 SCt 2164, 150

LE2d 292) (2001). Explicit authority to engage in notice-and-comment

rulemaking is not the only way to show the requisite legislative commitment of

the matter to the discretion of the agency, and compliance with notice-and-

14

comment rulemaking requirements is not the only way to show that the agency resolved the matter by way of a proper exercise of its discretion. See id. at 231 (II) (A) (noting that the United States Supreme Court has "sometimes found reasons for Chevron deference even when no such administrative formality was required and none was afforded"). See also Barnhart v. Walton, 535 U. S. 212, 222 (II) (122 SCt 1265, 152 LE2d 330) (2002). Even without notice-and-comment rulemaking, "it can still be apparent from the agency's generally conferred authority and other statutory circumstances that [the legislature] would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute . . . ." Mead, 533 U. S. at 229 (II) (A). Those other circumstances that may be indicative of a legislative commitment of the matter to the discretion of the Executive Branch include a charge to the agency to supervise the statutory law at issue and to assume primary responsibility for the subject of the law, see NationsBank of N.C. v. Variable Annuity Life Ins. Co., 513 U. S. 251, 256-257 (II) (A) (115 SCt 810, 130 LE2d 740) (1995), a statutory delegation of authority to the agency to execute and enforce the statute in question and to prescribe such rules and regulations as may be necessary to do so, see National Cable & Telecommunications Assn. v. Brand X Internet

15

<u>Svcs.</u>, 545 U. S. 967, 980 (III) (A) (125 SCt 2688, 162 LE2d 820) (2005), and "the interstitial nature of the legal question, the related expertise of the [a]gency, the importance of the question to [the] administration of the statute, the complexity of that administration, and the careful consideration the [a]gency has given the question over a long period of time." <u>Barnhart</u>, 535 U. S. at 222 (II).

Here, the record reflects that the administrative rules at issue were promulgated under the Georgia Administrative Procedure Act ("APA"), OCGA § 50-13-1 et seq., but the record does not disclose whether they were promulgated under the APA's notice-and-comment rulemaking provisions.[5] See OCGA § 50-13-4. If the rules were subject to the APA's notice-and-comment rulemaking requirements, and if they were adopted in a manner that was consistent with those requirements, then those circumstances would indicate that the rules qualify for deferential treatment. See <u>Pruitt Corp. v. Ga. Dept. of Community Health</u>, 284 Ga. 158, 159-160 (2) (664 SE2d 223) (2008) (rule or regulation that has "undergone the scrutiny" of notice-and-comment rulemaking

_____

[5] The notice-and-comment rulemaking requirements apply to "the adoption, amendment, or repeal of any rule, other than interpretative rules or general statements of policy." OCGA § 50-13-4 (a). In their briefs, the parties do not address whether the rules at issue here were subject to these statutory requirements. We can decide this case without resolving this question, and so, we do not resolve it today.

16

may be entitled to deference). But even assuming that the rules were not subject to the notice-and-comment rulemaking provisions of the APA, we perceive other indications that the General Assembly has committed the resolution of ambiguities in the teacher retirement statutes to the discretion of the System and that the System enacted the rules at issue in a proper exercise of that discretion.

Indeed, the General Assembly has provided explicitly that "[t]he administration and responsibility for the proper operation of the retirement system and for placing [the teacher retirement statutes] into effect are vested in the board of trustees," OCGA § 47-3-26 (a), and it has expressly authorized the System (through its board) to "establish rules and regulations for the administration of the funds created by this chapter and for the transaction of its business." OCGA § 47-3-26 (b). In our view, these provisions give the System "the authority to promulgate binding legal rules," which it has done "in the exercise of that authority." National Cable, 545 U. S. at 980-981 (III) (A). In addition, the System is "charged with the enforcement" of the teacher retirement statutes "to an extent that warrants [deference]." NationsBank, 513 U. S. at 256 (II) (A). Moreover, the legal question presented here — involving the calculation of retirement benefits — relates to the expertise of the System and

17

is important to its complex administration of the teacher retirement statutes. See Barnhart, 535 U. S. at 222 (II). And the rules in question were adopted more than 30 years ago and, therefore, are undoubtedly of longstanding duration. See id. at 220 (II). See also Suttles, 193 Ga. at 515 (4). For these reasons, the understanding of the System about the meaning of "two consecutive years," as reflected in its administrative rules, would be entitled to deference, so long as that understanding is reasonable.

We cannot say that the System is unreasonable to understand "two consecutive years" to mean 24 consecutive calendar months. In the first place, as we explained in Division 2 (a), this understanding is, we think, a natural and reasonable understanding of the text of OCGA § 47-3-120 (a) (2) (considered in its proper context), and it arguably is the *only* natural and reasonable understanding. Second, the record in this case does not show this understanding to be generally inconsistent with the usual payroll periods for teachers. Indeed, Tibbles (like many other teachers) appears to have been paid twice a month for her teaching, and there is no proof that any school system calculates teacher pay on a daily basis. Third, there is no indication that the System receives information about member compensation other than in connection with the

18

monthly remittance of contributions, and to the extent that its calculation of the amount to which a member is entitled is based on this information, the calculation necessarily would reflect compensation in terms of calendar months. In all, we conclude that the System was not unreasonable to understand OCGA § 47-3-120 (a) (2) to mean 24 consecutive calendar months when it speaks of "two consecutive years." To the extent that the statutory reference to "two consecutive years" is ambiguous, we would defer to the understanding of the System.

3. At oral argument, counsel for Tibbles conceded that she had to prevail on both of her contentions about the meaning of OCGA § 47-3-120 (a) (2) to establish that the System miscalculated the amount of her annual retirement allowance. Because her contention about the meaning of "two consecutive years" is without merit, her claim of miscalculation fails, and we need not address her remaining contention. The judgment of the trial court is affirmed.

Judgment affirmed. All the Justices concur.

19

Decided July 13, 2015 – Reconsideration denied July 23, 2015.

Mandamus. Fulton Superior Court. Before Judge LaGrua.

Carley, Gregory & Gregory, George H. Carley, Hardy Gregory, Jr., Antoinette D. Gregory; Nabors Law Group, William L. Nabors, Jr.; David C. Ates, for appellant.

Samuel S. Olens, Attorney General, Annette M. Cowart, Christopher A. McGraw, Senior Assistant Attorneys General, Bryan K. Webb, Assistant Attorney General, for appellees.