**FIFTH DIVISION**
**PHIPPS, P. J.,**
**DILLARD and PETERSON, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 21, 2016**

# In the Court of Appeals of Georgia

A16A0541.  MONTGOMERY   COUNTY,   GEORGIA   v.
HAMILTON.

DILLARD, Judge.

Montgomery County, Georgia (the "County") appeals from the trial court's denial of its motion for summary judgment, as well as the court's grant of summary judgment against it in this class-action lawsuit seeking a tax refund on behalf of S. Keith Hamilton and similarly situated taxpayers residing in the unincorporated area of the County (the "unincorporated area"). Specifically, Hamilton sought a refund of Insurance Premium Tax proceeds ("IPTP") that he alleged were used unlawfully by the County to fund certain "convenience centers" for the purpose of collecting and disposing of solid waste. On appeal, the County argues that the trial court erred in holding that its use of IPTP to pay the operating costs of the convenience centers was

unauthorized under OCGA § 33-8-8.3, in ordering the County to refund those proceeds to Hamilton and the other class members (collectively, the "plaintiffs"), and by including its expenditure of IPTP from tax years 2006 through 2009 in the total amount of the awarded refund. For the reasons set forth *infra*, we reverse the trial court's grant of summary judgment to the plaintiffs and remand the case for further proceedings consistent with this opinion.

The material facts underlying this appeal are undisputed.[1] Since 1998, the County has funded, staffed, and maintained five convenience centers,[2] which are located in the unincorporated area of the County and used for the purpose of collecting and disposing of solid waste. Thereafter, the County did not collect garbage or solid waste from the curbside of any residence or from the site of any property located in the unincorporated area. In fact, the County required the residents of that area to bring their trash to one of the five convenience centers for disposal.

---

[1] In conjunction with their cross-motions for summary judgment, the parties submitted a statement of stipulated material facts. But we note that, to the extent that any material facts are in dispute, we view them in a light most favorable to the County (*i.e.*, the nonmoving party). *See*, *e.g.*, *Fennelly v. Lyons*, 333 Ga. App. 96, 96 (775 SE2d 587) (2015).

[2] The convenience centers are sometimes referred to throughout the record as "recycling centers."

However, the County allowed anyone wishing to dispose of trash to use the centers. In 2005, the County began using IPTP to offset the cost of staffing and operating the convenience centers. Specifically, for the tax years of 2006 through 2014, the County spent the following amounts of IPTP in connection with operating the centers:

| 2006: | $59,680.26 |
|---|---|
| 2007: | $115,721.11 |
| 2008: | $136,424.45 |
| 2009: | $122,677.55 |
| 2010: | $131,420.59 |
| 2011: | $119,750.07 |
| 2012: | $142,526.00 |
| 2013: | $127,360.70 |
| 2014: | $151,479.60 |

On September 9, 2013, Hamilton submitted a request for a tax refund to the Montgomery County Commissioners for the years 2007 through 2009, for a total amount of $2,257.04. According to Hamilton, this amount represented the taxes levied on him "through the failure of Montgomery County Commissioners to correctly roll back the Insurance Premium Tax on inhabitants of the unincorporated area of Montgomery County." On September 25, 2013, the County denied Hamilton's request and informed him that the IPTP had been allocated to fund services that primarily benefit the inhabitants of the unincorporated area of the County. Hamilton then requested a tax refund from the County on behalf of himself and the other

3

property owners in the unincorporated area for the tax years 2006 through 2013, again alleging that the County had improperly levied taxes for those years. But the County denied this second request as well. Subsequently, Hamilton revised his refund request to include the 2014 tax year, and yet again, the County denied his request.

On December 18, 2013, Hamilton filed a "verified class action complaint" against the County, seeking a refund of a portion of IPTP for the tax years 2007 through 2012, which he contended had been used by the County for unauthorized purposes. Hamilton sought to initiate the action on his own behalf and other similarly situated property owners in the unincorporated area of the County. In addition to his request for a tax refund, Hamilton also asserted claims for declaratory relief, mandamus, permanent injunctive relief, and attorney fees for bad faith and stubborn litigiousness. The County answered, denying any wrongdoing and asserting several affirmative defenses. Hamilton then filed an amended complaint, alleging, *inter alia*, that the County's use of IPTP to fund the convenience centers was unauthorized under OCGA § 33-8-8.3 because that statute only permits the County to use such funds for "curbside or on[-]site residential or commercial garbage and solid waste collection." As a result of the allegedly unauthorized funding of the convenience

4

centers, Hamilton claimed that the class was entitled to a refund of these impermissible expenditures for the tax years 2006 through 2013.

Discovery ensued, after which the parties reached an agreement as to several of the allegations in the amended complaint, and the trial court issued a consent order memorializing their agreement. Consistent with this agreement, the court granted Hamilton's requests for mandamus, declaratory, and injunctive relief in some respects and denied them in others. In addition, the court granted Hamilton's request for class certification, ordering that the class would consist of property owners in the unincorporated area who paid property taxes in any year from 2006 through 2014. The certified class included three subclasses of property owners: those who paid property taxes during 2006 and 2007; those who paid property taxes during 2008 and 2009; and those who paid property taxes between 2010 and 2014. As a result of the consent order, the only unresolved issues in the case were: (1) whether OCGA § 33-8-8.3 authorized the County to use IPTP to pay the costs of operating its convenience centers for collecting solid waste; and (2) if not, what amount of ad valorem taxes must be refunded to Hamilton and the class of persons he represents? The court reserved ruling on these issues and ordered the parties to file cross-motions for summary judgment, addressing each issue, and to submit a set of stipulated facts.

Thereafter, in compliance with the consent order, the parties filed cross-motions for summary judgment and a set of stipulated facts. After the parties filed responses, the court issued an order, granting the plaintiffs' motion for summary judgment and denying the County's cross-motion. The court awarded the plaintiffs a total tax refund of $1,107,043.33, which represented the amount of IPTP used to operate the convenience centers from 2006 to 2014. The County then moved for reconsideration, arguing, *inter alia*, that due to the three-year statute of limitation for seeking tax refunds, the plaintiffs, who initiated this action in 2013, could not be awarded a refund for any taxes paid prior to 2010.[3] In connection with the motion for reconsideration, the County also filed a motion to partially set aside the court's judgment as to the tax years 2006 through 2009. Ultimately, the court denied both motions. This appeal follows.

At the outset, we note that on appeal from the grant of summary judgment, "we construe the evidence most favorably towards the nonmoving party, who is given the benefit of all reasonable doubts and possible inferences."[4] And the party opposing

_____

[3] The County acknowledged that it had not briefed the statute-of-limitation issue prior to filing its motion for reconsideration.

[4] *Nguyen v. Sw. Emergency Physicians, P.C.*, 298 Ga. 75, 82 (3) (779 SE2d 334) (2015) (punctuation omitted).

summary judgment is not required to produce evidence demanding judgment for it, but is "only required to present evidence that raises a genuine issue of material fact."[5] But when only a question of law is at issue, as here, we "owe no deference to the trial court's ruling and apply the 'plain legal error' standard of review."[6] Indeed, as recently noted by our Supreme Court, "[t]he interpretation of statutes . . . presents a question of law for the court."[7] With these guiding principles in mind, we turn now to the County's specific claims of error.

1. The County first argues that the trial court erred in ruling that its use of IPTP to staff and operate its convenience centers is unauthorized by OCGA § 33-8-8.3. We agree.

---

[5] *Id.* (punctuation omitted).

[6] *Coker v. Moemeka*, 311 Ga. App. 105, 107 (1) (714 SE2d 642) (2011) (punctuation omitted); *accord Artson, LLC v. Hudson*, 322 Ga. App. 859, 860 (747 SE2d 68) (2013).

[7] *Lue v. Eady*, 297 Ga. 321, 326 (2) (a) (773 SE2d 679) (2015); *see also Merry v. Williams,* 281 Ga. 571, 573 (2) (642 SE2d 46) (2007); *Monticello, Ltd. v. City of Atlanta,* 231 Ga. App. 382, 383 (1) (499 SE2d 157) (1998).

When we interpret any statute, we necessarily begin our analysis with "familiar and binding canons of construction."[8] In considering the meaning of a statute, our charge as an appellate court is to "presume that the General Assembly meant what it said and said what it meant."[9] Toward that end, we must afford the statutory text its plain and ordinary meaning,[10] consider the text contextually,[11] read the text "in its most natural and reasonable way, as an ordinary speaker of the English language

_____

[8] *Holcomb v. Long*, 329 Ga. App. 515, 517 (1) (765 SE2d 687) (2014); *accord In re L. T.*, 325 Ga. App. 590, 591 (754 SE2d 380) (2014).

[9] *Holcomb*, 329 Ga. App. at 517 (1) (punctuation omitted); *accord Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013).

[10] *Holcomb*, 329 Ga. App. at 517 (1); *accord Deal*, 294 Ga. at 172 (1) (a); *see also Tibbles v. Teachers Retirement Sys. of Ga.*, 297 Ga. 557, 558 (775 SE2d 527) (2015) ("A statute draws it meaning, of course, from its text.") (punctuation and citation omitted); *Chan v. Ellis,* 296 Ga. 838, 839 (1) (770 SE2d 851) (2015) (same); *State v. Able*, 321 Ga. App. 632, 636 (742 SE2d 149) (2013) ("A judge is charged with interpreting the law in accordance with the original and/or plain meaning of the text at issue (and all that the text fairly implies) . . . .").

[11] *Holcomb*, 329 Ga. App. at 517 (1); *see also Arizona v. Inter Tribal Council of Arizona, Inc.*, ___ U.S. ___ (II) (B) (133 SCt 2247, 2254, 186 LEd2d 239) (2013) (Scalia, J.) ("Words that can have more than one meaning are given content, however, by their surroundings." (punctuation and citation omitted)); *Tibbles*, 297 Ga. at 558 ("The common and customary usages of the words are important, but so is their context.") (punctuation and citation omitted); *Chan,* 296 Ga. at 839 (1) (same); *Deal*, 294 Ga. at 172 (1) (a) ("[W]e must view the statutory text in the context in which it appears[.]").

8

would,"[12] and seek to "avoid a construction that makes some language mere surplusage."[13] And when the language of a statute is "plain and susceptible to only one natural and reasonable construction, courts must construe the statute accordingly."[14] Finally, we note that when a taxing statute has doubtful meaning, it must be construed forgivingly "in favor of the taxpayer and against the State."[15]

Turning to the specific statute at issue here, OCGA § 33-8-8.3 provides:

(a) The proceeds from the county taxes levied for county purposes,[16] as provided by this chapter, shall be separated from other county funds and shall be used by the county governing authorities solely for the purpose of either:

---

[12] *Holcomb*, 329 Ga. App. at 518 (1) (punctuation omitted); *accord Deal*, 294 Ga. at 172-73 (1) (a).

[13] *Holcomb*, 329 Ga. App. at 518 (1) (punctuation omitted); *accord In the Interest of L.T.*, 325 Ga. App. at 592.

[14] *Holcomb*, 329 Ga. App. at 518 (1) (punctuation omitted); *accord Luangkhot v. State*, 292 Ga. 423, 424 (1) (736 SE2d 397) (2013); *see also Deal*, 294 Ga. at 173 (1) (a) ("[I]f the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning is at an end." (punctuation omitted)).

[15] *Telecom\*USA, Inc. v. Collins*, 260 Ga. 362, 364 (1) (393 SE2d 235) (1990).

[16] It is undisputed that the County's use of IPTP is governed by OCGA § 33-8-8.3.

9

(1) Funding the provision of the following services to inhabitants of the unincorporated areas of such counties directly or by intergovernmental contract as authorized by Article IX, Section III, Paragraph I of the Constitution of the State of Georgia:

(A) Police protection, except such protection provided by the county sheriff;

(B) Fire protection;

(C) Curbside or on-site residential or commercial garbage and solid waste collection;

(D) Curbs, sidewalks, and street lights; and

(E) Such other services as may be provided by the county governing authority for the primary benefit of the inhabitants of the unincorporated area of the county; or

(2) Reducing ad valorem taxes of the inhabitants of the unincorporated areas of those counties in which the governing authority of a county does not provide any of the services enumerated in paragraph (1) of this subsection to inhabitants of the unincorporated areas. In fixing the ad valorem tax millage rate for the year 1984 and any year thereafter, the governing authorities of such counties shall be authorized and directed to reduce such ad valorem tax millage rate on taxable property within the unincorporated areas of such counties to offset any of

10

the proceeds derived from any tax provided for in this chapter which cannot be expended pursuant to paragraph (1) of this subsection.

On appeal, the County argues that the trial court erred in granting summary judgment to the plaintiffs because its expenditures of IPTP to partially fund the convenience centers is authorized under the statute's "catchall" provision, OCGA § 33-8-8.3 (a) (1) (E).[17] In construing this statute, the trial court rejected that argument, finding that its general catchall provision could not authorize the use of IPTP for services of a similar type as those specifically identified in subsections (a) (1) (A)-(D). Focusing on the word "other" in OCGA § 33-8-8.3 (a) (1) (E), the trial court reasoned that, by specifically identifying curbside and on-site waste collection as authorized services in subsection (a) (1) (C), the statute necessarily prohibited the County from using IPTP to fund any other type of waste-collection services, such as its remote, off-site convenience centers. According to the trial court (and the

---

[17] Although the County also argued to the trial court that its convenience centers qualified as "on-site" waste collection under OCGA § 33-8-8.3 (a) (1) (C), the County does not reassert that argument on appeal, and thus, has abandoned it. *See Guilford v. Marriott Int'l, Inc.*, 296 Ga. App. 503, 504 (675 SE2d 247) (2009) (deeming claims of error abandoned when they were unsupported by citation to authority or argument).

11

plaintiffs), if the General Assembly meant to authorize the funding of "drop off" or off-site waste-collection centers, it would have omitted the words "curbside" and "on-site" from section (a) (1) (C) *or* used the term "similar" or "like" in section (a) (1) (E). We find this argument unavailing.

OCGA § 33-8-8.3 (a) (1) (E) expressly authorizes the use of IPTP to fund services that are "similar" or "like" (*i.e.*, "such other services . . ."), but other than, the enumerated services identified in subsections (a) (1) (A)-(D), so long as the County provides them "for the primary benefit of the inhabitants of the unincorporated area of the [C]ounty." Indeed, this is exactly what the County argued below, but the trial court disagreed. In doing so, the trial court noted that "the use of the term 'other' connotes dissimilar, not similar services."[18] But "other" may not be read in isolation from the phrase (and context) in which it is used.[19] And here, subsection (a) (1) (E) plainly authorizes the use of IPTP to provide "*such* other services" as the ones previously listed, not merely "other services." Suffice it to say, "such other," when

---

[18] *See* THE COMPACT OXFORD ENGLISH DICTIONARY 1231 (2d ed. 1991) (defining "other" as, *inter alia*, "[e]xisting distinct from[ ] that already mentioned or implied; not this, not the same, different in identity; further, additional" and "different in kind or quality").

[19] *See supra* footnote 11 & accompanying text.

used after a specific list of items (as in this case), ordinarily means *similar* in kind or class or *like* the items previously identified.[20] Thus, in OCGA § 33-8-8.3 (a) (1) (E), because *both* "such"and "other" immediately precede the word "services," and because those words, read in isolation, have antithetical meanings (*i.e.*, similar and different), the only reasonable interpretation of the phrase "such other services" is that the authorized services must be similar to, but different in some respects from, the specific services identified in the previous subsections. And without question, off-site waste-collection services, such as those at issue here, are similar to, but different from, curbside or on-site waste-collection services.

Significantly, our construction of the phrase "such other services" in OCGA § 33-8-8.3's catchall provision is consistent with the Supreme Court of Georgia's application of the statutory-construction canon "*ejusdem generis*," which provides:

> [W]hen a statute or document enumerates by name several particular things, and concludes with a general term of enlargement, this latter term is to be construed as being ejusdem generis [i.e., of the same kind

___

[20] *See The Compact Oxford English Dictionary* 1951 (defining "such" as, *inter alia*, "of the *same* kind or class as something mentioned or referred to; of that kind; *similar*; or *like*" (emphasis supplied)); *Black's Law Dictionary* 1446 (defining "such" as "[o]f this or that kind . . . That or those; having just been mentioned . . . .").

13

or class] with the things specifically named, unless, of course, there is something to show that a wider sense was intended.[21]

Although the trial court found that the canon of *ejusdem generis* does not apply here because there is no common trait or quality of the specific services identified in

_____

[21] *Ctr. For A Sustainable Coast v. Coastal Marshlands Prot. Comm.*, 284 Ga. 736, 737-38 (1) (670 SE2d 429) (2008). It is worth noting that our Supreme Court has applied *ejusdem generis* in construing statutes even when, as here, the general term of enlargement uses the word "other" following an enumerated list of items. *See Ga. Bd. of Chiropractic Examiners v. Ball*, 224 Ga. 85, 89 (1) (160 SE2d 340) (1968) ("It is a well known rule that in construing a statute where certain acts are specified which are followed by a general expression referring to *other* acts, *such other acts must be of like character with those named*. Ejusdem generis is a rule of construction to ascertain and give effect to legislative intent [as reflected in the plain meaning of the relevant text]." (punctuation omitted) (emphasis supplied)); *Standard Oil Co. v. Swanson*, 121 Ga. 412, 415 (49 SE 262, 263) (1904) ("[When] a statute or other document enumerates several classes of persons or things, and immediately following, and classed with such enumeration, the clause embraces 'other' persons or things, the word '*other*' will generally be read as 'other *such like*,' so that persons or things therein comprised may be read as *ejusdem generis* with, and not of a quality superior to or different from, those specifically enumerated. This rule is well established in this State." (citations omitted) (emphasis supplied)); *see also Longleaf Energy Associates, LLC v. Friends of Chattahoochee, Inc.*, 298 Ga. App. 753, 759 (2) (681 SE2d 203) (2009) ("Under the rule of statutory construction known as 'ejusdem generis,' when a generally described activity such as '*otherwise* is subject to regulation' follows an enumeration of specifically described activities, the general activity will ordinarily be construed as referring to the same kind or class of activity as the preceding specific activities, unless something shows that a wider sense was intended." (punctuation omitted) (emphasis supplied)); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF STATUTORY TEXTS 199 (1st ed. 2012) ("The principle of *ejusdem generis* essentially says just that: It implies the addition of *similar* after the word *other*.").

OCGA § (a) (1) (A)-(D), we disagree. As noted by the County, each of the listed services provide for the health, safety, or welfare of the residents of the unincorporated area. And applying *ejusdem generis* in construing the statute's "general term of enlargement," any "other" service provided by the County under subsection (a) (1) (E), such as the convenience centers, must do the same. In sum, under the plain language of OCGA § 33-8-8.3, the use of IPTP to operate the County's convenience centers *may* be authorized by the statute's catchall provision, *but only if*, as discussed *passim*, it meets that subsection's requirement that these remote, off-site waste-collection centers primarily benefit the residents of the unincorporated area.[22]

Nevertheless, relying on a "species of *noscitur a sociis*,"[23] the trial court found that, as the more specific provision regarding waste collection, OCGA § 33-8-8.3 (a) (1) (C) controlled such that the more expansive catchall provision could not authorize

---

[22] *See* OCGA § 33-8-8.3 (a) (1) (E).

[23] As the Supreme Court of Georgia has explained, "under the canon of *noscitur a sociis*, the words in [a statute] should be understood in relation to each other, since words, like people, are judged by the company they keep." *Warren v. State*, 294 Ga. 589, 590-91 (1) (755 SE2d 171) (2014); *see also Patrick v. Huff*, 296 Ga. App. 343, 347 (1) (674 SE2d 398) (2009) ("Words, like people, are judged by the company they keep. *Noscitur a sociis*. The critical phrase thus must be gauged by the words surrounding it." (punctuation omitted)).

any type of waste collection not specifically enumerated in subsection (a) (1) (C). Specifically, the trial court relied on the following principle of statutory construction, which the Supreme Court of Georgia has likewise approved:

> [When] there is in the same statute a specific provision, and also a general one which in its most comprehensive sense would include matters embraced in the former, the particular provision must control, and the general provision must be taken to affect only such cases within its general language as are not within the provisions of the particular provision.[24]

But in this particular case, subsection (a) (1) (E) *expressly authorizes* the use of IPTP for services that are *similar to* those enumerated in the preceding, more specific, subsections ("such other services . . ."), which means there is no need to resort to this canon of statutory construction. Indeed, the County's off-site convenience centers are similar to curbside and on-site waste collection because both services provide for the waste-collection needs of County businesses and residents. Moreover, to the extent that "curbside" and "on-site" waste collection, as identified in the more specific provision of subsection (a) (1) (C), could be included as an authorized service under

---

[24] *Mayor & Alderman of the City of Savannah v. Savannah Elec. & Power Co.*, 205 Ga. 429, 436-37 (54 SE2d 260) (1949), *quoting* 50 AM. JUR. 371, § 367.

16

subsection (a) (1) (E) in its "most comprehensive sense," subsection (a) (1) (C) would control only to the extent that the County could rely on that specific provision and would be relieved of its burden, under the catchall provision (*i.e.,* subsection (a) (1) (E)), to establish that the service primarily benefits the inhabitants of the unincorporated area. Nothing in the application of *noscitur a sociis* in the case *sub judice* remotely suggests that a different method of providing waste collection, although not authorized by the more specific provision, cannot still be authorized if it meets the criteria of the general catchall provision.

Furthermore, contrary to the plaintiffs' contention, our construction of OCGA § 33-8-8.3 does not render the words "curbside" and "on-site" in subsection (a) (1) (C) meaningless or mere surplusage. The plaintiffs assert that, if the General Assembly had sought to allow any type of waste-collection service, it would have omitted the words "curbside or on-site" from the statute. But in support of this argument, the plaintiffs rely solely on cases involving the construction of statutes with an enumerated list of items, but no accompanying catchall provision.[25] Indeed,

_____

[25] *See Frix v. State*, 298 Ga. App. 538, 540-41 (1) (680 SE2d 582) (2009) (holding that a statute that defined "electronic storage device" as "including floppy disks and other magnetic storage devices" or "CD-ROM" did not include text messages sent via cell phone); *Trench Shoring Servs. of Atlanta, Inc. v. Westchester Fire Ins. Co.*, 274 Ga. App. 850, 851-52 (619 SE2d 361) (2005) (holding that a

17

each of those cases concerned whether some item qualified as one of the specifically enumerated items, not whether it met the requirements of a broad catchall provision. And here, we need not determine whether the County's convenience centers qualify as "curbside" or "on-site" waste collection under subsection (a) (1) (C), but rather, whether the use of IPTP to fund off-site waste collection may be authorized by subsection (a) (1) (E). Moreover, the words "curbside" and "on-site" in subsection (a) (1) (C) are not mere surplusage because they operate to eliminate the requirement that the County prove that the provided services are primarily for the benefit of the inhabitants of the unincorporated area and to identify the specific types of waste-collection services that, unlike the convenience centers, will be funded by IPTP if the County chooses to provide them.[26] And in fact, the trial court's construction of OCGA

statute providing that a person shall have a special lien on the real estate, factories, railroads, or other property for which they furnish labor, services, or materials did not extend to persons performing work that was not on the development property itself); *State v. Foote*, 225 Ga. App. 222, 223 (1) (483 SE2d 628) (1997) (holding that a statute providing that "a property interest shall not be subject to forfeiture . . . for a violation involving one gram of cocain or less" required the State to demonstrate that a mixture that tested "positive for cocaine" actually contained "one gram minimum of 'pure' cocaine" for the statute to apply).

[26] *See* OCGA § 33-8-8.3 (a) (providing that the proceeds from the county taxes levied for county purposes "*shall be used*" by the County for the services enumerated in subsection (1), which expressly includes curbside or on-site residential or commercial garbage and solid waste collection).

18

§ 33-8-8.3 renders the word "such" in subsection (a) (1) (E) utterly meaningless because, under its construction, the catchall provision could only authorize the use of IPTP for services that have *no* similarities whatsoever to those specifically enumerated.

Although not expressly relied upon by the trial court, the plaintiffs argue that the trial court's construction of the statute is "demanded" by the negative-implication canon of construction, *expressio unius est exclusio alterius*, which means "the expression of one thing implies the exclusion of the other."[27] But as Justice Antonin Scalia and Bryan Garner emphasize in *Reading Law: The Interpretation of Legal Texts*, the negative-implication canon "must be applied with great caution, since its application depends so much on context."[28] And in this case, there is nothing about the relevant statutory context remotely suggesting that off-site waste-collection services are affirmatively *excluded* by subsection (a) (1) (C), regardless of who those services benefit. As discussed *supra*, reading subsections (a) (1) (C) and (a) (1) (E) *in context*, the statute expressly authorizes and requires the use of IPTP for curbside

---

[27] *McAlister v. Abam Samson*, 318 Ga. App. 1, 4 (1) n.13 (733 SE2d 58) (2012) (punctuation omitted).

[28] SCALIA & GARNER, *supra* footnote 21, at 107; *see, e.g.*, *McAlister*, 318 Ga. App. at 4 (1) n.13.

and on-site waste collection, while only authorizing the use of IPTP for alternative methods of waste collection *if* those services primarily benefit the inhabitants of the unincorporated area.[29] Significantly, subsection (a) (1) (A) affirmatively excludes police-protection services provided by the County sheriff from the types of police-protection services that may be funded with IPTP.[30] In light of that exclusion, we must presume that if the General Assembly had sought to exclude particular types of waste-collection services under subsection (a) (1) (C) (regardless of who they benefit), it certainly knew how to do so.[31] Indeed, under these particular

---

[29] *See* OCGA § 33-8-8.3 (a) (1) (C), (E).

[30] *See* OCGA § 33-8-8.3 (a) (1) (A).

[31] *See*, *e.g.*, *Bauerband v. Jackson Cty. Bd. of Comm'rs*, 278 Ga. 222, 225-26 (3) (598 SE2d 444) (2004) (noting that the use of the terms "sums payable in the individual calendar year renewal term" and "annual payments" elsewhere in a statute showed that, "had the General Assembly wished to require that future obligations be set forth as a sum certain [in the instant provision], it knew how to accomplish that"); *Avila v. State*, 333 Ga. App. 66, 69-70 (775 SE2d 552) (2015) (noting that the General Assembly's use of the phrase "during the commission of crime" in certain subsections of a criminal statute made clear that it knew how to specify that a disqualifying event must occur while the crime was in process, and that the subsection at issue did not include such a limitation); *Inland Paperboard & Packaging, Inc. v. Ga. Dep't of Revenue*, 274 Ga. App. 101, 104 (616 SE2d 873) (2005) (noting that if the General Assembly intended to include a particular exemption in a tax statute, the statutory history showed that it knew how to do so).

20

circumstances, "[w]e must presume that its failure to do so was a matter of considered choice."[32]

Finally, because the trial court erroneously concluded that the County's use of IPTP to operate its convenience centers could not be authorized by OCGA § 33-8-8.3's catchall provision, it did not reach the question of whether the centers satisfied that provision's requirement that they be provided "for the primary benefit of the inhabitants of the unincorporated area of the [C]ounty." And because we hold that the County's use of IPTP to fund its convenience centers *may* be authorized by the statute's catchall provision if it meets that subsection's "primary benefit" requirement, we remand the case for the trial court to address this issue and to reconsider, in light of this opinion, whether the County's use of IPTP to fund its convenience centers is authorized under OCGA § 33-8-8.3 (a) (1) (E).

---

[32] *Inland Paperboard & Packaging, Inc*, 274 Ga. App. at 104 (d) (punctuation omitted), *quoting Hollowell v. Jove*, 247 Ga. 678, 683 (279 SE2d 430) (1981); *see Transp. Ins. Co. v. El Chico Restaurants, Inc.*, 271 Ga. 774, 776 (524 SE2d 486) (1999) ("We must presume that the [l]egislature's failure to include the limiting language was a matter of considered choice."); *Citibank (S. Dakota), N.A. v. Graham*, 315 Ga. App. 120, 122 (1) (726 SE2d 617) (2012) (noting that, when the General Assembly provided for a tax refund in a different statutory provision, "we must presume that the legislature's failure to provide a refund under [the statute at issue] was a matter of considered choice" (punctuation omitted)).

2. Given our holding in Division 1 *supra* (*i.e.*, that the case must be remanded to the trial court for further consideration), we find it premature to address the County's remaining claims of error.

For all of the foregoing reasons, we reverse the trial court's grant of summary judgment to the plaintiffs and remand for further proceedings consistent with this opinion.

*Judgment reversed and case remanded. Phipps, P. J., and Peterson, J., concur.*