S07G1745. CENTER FOR A SUSTAINABLE COAST et al.
v. COASTAL MARSHLANDS PROTECTION COMMITTEE et al.

(670 SE2d 429)

HINES, Justice.

This Court granted certiorari to the Court of Appeals in *Coastal Marshlands Protection Committee v. Center for a Sustainable Coast*, 286 Ga. App. 518 (649 SE2d 619) (2007) (*"CMPC v. CSC"*), to determine whether the Court of Appeals correctly construed the Coastal Marshlands Protection Act, OCGA § 12-5-280 et seq. ("CMPA"), as it relates to the regulation of certain activities in upland areas in conjunction with the regulation of activities in the marshlands. Finding that the Court of Appeals properly held that regulation under the CMPA does not extend to residential activities in upland areas, we affirm.[1]

Under the CMPA, the Coastal Marshlands Protection Committee ("Committee") considers permit applications for projects in coastal marshlands. The Committee was created by the CMPA and is composed of the Commissioner of Natural Resources and four other persons selected by the Board of Natural Resources. See OCGA § 12-5-283. In 2005, the Committee issued a permit to Point Peter, LLLP, a residential developer, which authorized Point Peter to construct and maintain three community day docks and two full service marinas on certain marshlands as part of a 1,014 acre residential development. The permit included various conditions designed to avoid unreasonable adverse impact to the marshlands.

The Center for a Sustainable Coast and other organizations (collectively "CSC") challenged the permit on a variety of grounds, including that the Committee failed to regulate the upland portions of Point Peter's development. An administrative law judge ("ALJ") agreed with CSC as to this ground, and, inter alia, remanded this

---

[1] No question of lower court jurisdiction is before this Court in this case. The jurisdictional issue was distinctly addressed in the Court of Appeals, a petition for a writ of certiorari was filed in this Court, and granted, with this Court posing the sole question:

Whether the Coastal Marshlands Protection Act, OCGA § 12-5-280 et seq., authorizes the Coastal Marshlands Protection Committee to regulate activities in upland areas that adversely impact marshlands in connection with its consideration of applications for permits to build on the marshlands.

Briefing before this Court was confined to that question, in compliance with Supreme Court Rule 45.

permit issue to the Committee for further consideration. The Committee and Point Peter sought review in the Superior Court of Fulton County, which did not act upon the matter in the time specified by statute, and the ALJ's decision was affirmed by operation of law. See OCGA § 12-2-1 (c). The Committee and Point Peter then sought, and were granted, discretionary appeal in the Court of Appeals, which affirmed in part and reversed in part the ALJ's decision, holding that the permitting power of the Committee did not extend to regulating residential upland portions of the development. See *CMPC v. CSC*, supra. Further factual and procedural details can be found in the opinion of the Court of Appeals. Id.

1. Under OCGA § 12-5-286 (a), "[n]o person shall remove, fill, dredge, drain, or otherwise alter any marshlands or construct or locate any structure on or over marshlands in this state within the estuarine[2] area thereof without first obtaining a permit from the committee . . . ." As the Court of Appeals noted, the ALJ focused upon the term "otherwise alter" when ruling that the permit must be remanded to the Committee for consideration of whether the upland component of the development would adversely alter the marshlands by such processes as storm water runoff. And, the Court of Appeals was correct in holding that the use of the term "otherwise alter" in OCGA § 12-5-286 (a) is not authority for a determination that the Committee's jurisdiction extends to the residential upland areas. Rather, OCGA § 12-5-286 (a) defines those activities in the marshlands that require that prior permits be obtained. Point Peter was required to secure a permit because it intended to place structures in the marshlands; the permitting process was not triggered because of any other activity that could be deemed to "otherwise alter" the marshlands.

In determining that the term "otherwise alter" did not extend the Committee's jurisdiction to the residential uplands, the Court of Appeals used the statutory canon of construction "ejusdem generis." Under this principle,

> when a statute or document enumerates by name several particular things, and concludes with a general term of enlargement, this latter term is to be construed as being

---

[2] It is undisputed that the upland areas involved are not within the "estuarine area," which is defined in OCGA § 12-5-282 (7) as "all tidally influenced waters, marshes, and marshlands lying within a tide-elevation range from 5.6 feet above mean tide level and below." Additionally, " '[c]oastal marshlands' or 'marshlands' means any marshland intertidal area, mud flat, tidal water bottom, or salt marsh in the State of Georgia within the estuarine area of the state, whether or not the tidewaters reach the littoral areas through natural or artificial watercourses." OCGA § 12-5-282 (3).

ejusdem generis [i.e., of the same kind or class] with the things specifically named, unless, of course, there is something to show that a wider sense was intended. [Cits.]

*Dept. of Transp. v. Montgomery Tank Lines*, 276 Ga. 105, 106, n. 5 (575 SE2d 487) (2003). Thus, the Court of Appeals concluded that, since OCGA § 12-5-286 (a) reads "[n]o person shall remove, fill, dredge, drain, or otherwise alter any marshlands or construct or locate any structure on or over marshlands . . . ,"

to "otherwise alter" the marshlands in the statute refers to activities of the same kind or class as "remove, fill, dredge, [or] drain." It follows that the CMPA can be construed to regulate storm water runoff into the marshlands under the "otherwise alter[s]" provision of OCGA § 12-5-286 (a) only to the extent that the runoff alters the marshlands in a direct physical manner akin to removing, filling, dredging, or draining the marshlands.[3]

*CMPC v. CSC*, supra at 528 (2). CSC disputes the Court of Appeals's use of ejusdem generis, contending that the statute shows no ambiguity, and the canon is thus inapplicable. See *Dept. of Transp.*, supra at 107 (1). CSC is correct that there is no ambiguity in the statute; however, considerable ambiguity would arise if the phrase "otherwise alter" was given the reading the ALJ applied.

The ALJ remanded this permit issue to the Committee to determine if construction of the upland portions of the project "otherwise alter[ed] any marshlands" through effects such as storm water runoff, and concluded that OCGA § 12-5-286 (a) mandated that such a consideration be part of the Committee's review of a proposed project. But, as noted above, the statutory role of OCGA § 12-5-286 (a) is to set forth those circumstances in which a permit must be obtained from the Committee. If alteration of the marshlands through upland storm water runoff was within the meaning of "otherwise alter" in OCGA § 12-5-286 (a), it would require that any project, even an upland project located miles from the marshlands, would have to undergo the permitting process if it could be shown that storm water runoff from the project would affect the marshlands. And, such a reading would create an ambiguity when read with the CMPA's direction that, "[i]f the project is not water related or dependent on waterfront access or can be satisfied by the use of an alternative nonmarshland site or by use of existing public facilities,

---

[3] The Court of Appeals noted that there was no evidence that storm water drainage produced any such alteration of the marshlands.

a permit usually should not be granted pursuant to Code Section 12-5-286." OCGA § 12-5-288 (a). Under the ALJ's reading of "otherwise alter" in OCGA § 12-5-286 (a), the permitting reach of the Committee would extend to upland areas even miles away from the marshes and coastal waters, which does not mesh with OCGA § 12-5-288 (a)'s admonition that a project not water-related should not gain a permit under the CMPA. Accordingly, the Court of Appeals did not err in applying ejusdem generis, and was correct in determining that the term "otherwise alter" applies "only to the extent that the runoff alters the marshlands in a direct physical manner akin to removing, filling, dredging, or draining the marshlands." *CMPC v. CSC*, supra at 528 (2).

This application of ejusdem generis comports with the content of the statute when read as a whole. OCGA § 12-5-286 (a) determines whether a permit is required, and the reading of "otherwise alter" that the ALJ pronounced would "vastly extend the jurisdiction of the CMPA" and "sweep under the authority of the CMPA" any upland activities, whether those activities were on the coast, or even "inland along rivers and their watersheds that flow to the coast, which generated polluted runoff that eventually reached and caused some alteration of the coastal marshlands." *CMPC v. CSC*, supra at 527 (2). Requiring that all potential actors secure a permit from the Committee before engaging in such activities is a grant of authority and responsibility to the Committee so immense that it simply cannot be squared with the General Assembly's intent. Rather, in stating legislative determinations and declarations behind the CMPA, the General Assembly, after reciting the importance of marshlands to the State, declared

> that *activities and structures in the coastal marshlands* must be regulated to ensure that the values and functions of the coastal marshlands are not impaired and to fulfill the responsibilities of each generation as public trustees of the coastal marshlands for succeeding generations.

OCGA § 12-5-281 (emphasis supplied). The structure of the statute, and the language used therein, show an intent for a far more limited role for the Committee; it is the statutorily-defined activities and physical structures in the marshlands that trigger the need to secure a permit, and the Court of Appeals did not err in refusing to accept the statutory reading adopted by the ALJ.

2. CSC also asserts that, once the requirement for a permit is established, the scope of the Committee's review extends to all facets of a development such as Point Peter's, wherever situated, and that the Committee must exercise such a broad review in the public

interest. The General Assembly has addressed the issue of the public interest as it pertains to the Committee's review, and specifically declared what that interest is.

> In passing upon the application for permit, the committee shall consider the public interest, which, for purposes of this part, shall be deemed to be the following considerations:
>
>> (1) Whether or not unreasonably harmful obstruction to or alteration of the natural flow of navigational water within the affected area will arise as a result of the proposal;
>>
>> (2) Whether or not unreasonably harmful or increased erosion, shoaling of channels, or stagnant areas of water will be created; and
>>
>> (3) Whether or not the granting of a permit and the completion of the applicant's proposal will unreasonably interfere with the conservation of fish, shrimp, oysters, crabs, clams, or other marine life, wildlife, or other resources, including but not limited to water and oxygen supply.

OCGA § 12-5-286 (g).

CSC argues that, as storm water drainage can affect water quality, OCGA § 12-5-286 (g) (3) grants the Committee the power to examine the storm water aspects of any and all upland portions of the development. However, no such power is granted by the statute. The CMPA is geared toward regulation of the coastal marshlands, which are defined in a manner that does not include upland areas. See OCGA § 12-5-282 (3). The Committee is clearly assigned certain responsibilities, and thus must develop expertise, regarding "piers, docks, floating docks, marine railways, dolphins, pilings, appurtenances thereto, and all facilities and improvements that shall be reasonably used for or in connection therewith . . . ," OCGA § 12-5-287 (a), but no such responsibility for, or expertise regarding, upland residential developments is specified. And, reading OCGA § 12-5-286 (g) (3) to establish such responsibility would create certain anomalies under the statute. For instance, if an upland residential development was built without any structures being placed in the marshlands, no permit would be required, and that development would be completely beyond review by the Committee. Such a result would frustrate what CSC contends is the Committee's responsibility under the CMPA.

In this case, it is particularly instructive to examine the interpretation of the CMPA adopted by the Department of Natural Resources. Ordinarily, "the interpretation of a statute by an administrative agency which has the duty of enforcing or administering it is to be given great weight and deference. [Cit.]" *Ga. Dept. of Revenue v. Owens Corning*, 283 Ga. 489, 490 (660 SE2d 719) (2008). "Although this Court is 'not bound to blindly follow' an agency's interpretation, we defer to an agency's interpretation when it reflects the meaning of the statute and comports with legislative intent." *Schrenko v. DeKalb County School Dist.*, 276 Ga. 786, 792 (2) (582 SE2d 109) (2003). This deference is particularly warranted here, because, in crafting the CMPA, the General Assembly specifically stated that the Department of Natural Resources is authorized "to determine jurisdiction under [the CMPA]." OCGA § 12-5-284 (a) (1). The Department has issued an administrative rule addressing the extent of the Committee's jurisdiction to regulate upland areas in regard to storm water drainage and buffers around permitted projects; the rule defines the "upland component of the project" as

> all those service areas, amenities, and recreational areas located inland of the Coastal Marshlands Protection Act jurisdiction line, that serve or augment the functioning of the marshlands component of the project, such as, but not limited to, dry stack boat storage; dockmaster shop; fuel storage and delivery facilities to serve the marshlands component of the project; and restrooms intended for users of the marshlands component of the project. This term may extend to and cover such facilities adjacent to or in proximity to the marshlands component of the project that are intended to serve exclusively or primarily the users of the marshlands component of the project if the Committee finds in its sole discretion that such facility is likely to alter the marshlands.

Ga. Comp. R. & Regs. r. 391-2-3-.02 (2) (q).

CSC asserts that this regulation actually shows that the Department interprets the statute to give the Committee jurisdiction over upland areas that are beyond the marshlands components of projects, and that the Department arbitrarily limited the Committee's reach only to facilities that "serve or augment the functioning of the marshlands component [which may include facilities] adjacent to or in proximity to the marshlands component of the project . . . ." Ga. Comp. R. & Regs. r. 391-2-3-.02 (2) (q). However, there is a reasonable statutory basis for the manner in which the Department has construed its jurisdiction.

> Upon application by any interested person for a lease [of State-owned marshlands] pursuant to this Code section, the committee shall determine whether or not the applicant is an eligible person. *The committee must also determine whether or not the applicant has sufficient lands properly to service the area to be leased.* If the committee determines that the applicant is an eligible person and that *sufficient lands exist to service the marina or dock,* then the committee is authorized to grant and convey to the applicant a lease of the state owned marshland or water bottoms, or a combination thereof, described in the application without the necessity of public bid.

OCGA § 12-5-287 (b) (emphasis supplied). Thus, the Department's rule simply reflects the CMPA's concern about lands needed to properly service the permitted project actually in the marshlands. The Department's decision that the Committee's purview includes lands "adjacent to or in proximity to the marshlands" reflects the intent of the CMPA, comports with the legislative scheme, and is properly afforded deference; it is not evidence that the Department has arbitrarily limited the jurisdiction of the Committee to something less than that intended by the General Assembly.[4]

Nothing in the CMPA shows any intent on the part of the General Assembly to establish the Committee as the "super regulator" of any and all development in the coastal areas of the State. Rather, other appropriate regulation schemes play congruent roles, and those roles are recognized in the CMPA. As the Court of Appeals noted, mechanisms are in the CMPA by which

> [t]he CMPA recognizes the existence of . . . other regulations by requiring that a permit application include a letter from the local governing authority that the proposed project does not violate any zoning law, a copy of any required water quality certification for the proposed project issued by the [Department of Natural Resources], and a certification of adherence to soil and erosion control responsibilities if required for the proposed project. OCGA § 12-5-286 (b) (6), (10), (11). If another agency or governing authority denies a permit necessary for the project, the permit application

---

[4] CSC also argues that because the administrative rule was adopted while this litigation was pending, the rule was intended to influence the litigation and was not a genuine administrative interpretation. However, CSC cites nothing in the record to support this contention, and this Court will not declare an exception to the normal rules of deference merely because an administrative agency issues a rule or regulation at a time when there is a pending dispute regarding the subject of that rule or regulation.

under the CMPA shall stand denied. OCGA § 12-5-286 (q). These CMPA provisions further demonstrate that the legislature did not intend that the CMPA regulate ordinary storm water runoff into the marshlands generated by upland development that was not part of the upland component of a permitted project described and regulated under OCGA § 12-5-286.

*CMPC v. CSC*, supra at 529 (2). The role of the Committee's regulation power through the permitting process is intended to be limited to the CMPA's stated scope, the marshlands themselves.

Ultimately, CSC argues that there are certain policy considerations that favor this Court's giving the broad reading of the Committee's power urged by CSC. However, such policy decisions are for the General Assembly, and it has not chosen the policy course that CSC advocates.

*Judgment affirmed. All the Justices concur, except Sears, C. J., and Hunstein, P. J., who dissent.*

SEARS, Chief Justice, dissenting.

I respectfully dissent. The superior court prematurely intervened in an ongoing administrative process when it entertained a challenge to an interlocutory remand order issued by an administrative law judge (ALJ) acting on behalf of the Department of Natural Resources (Department). Under the Georgia Administrative Procedure Act (Georgia APA),[5] the superior court's subject matter jurisdiction to conduct appellate review of agency action in a contested case is strictly confined to the agency's "final decision" in the matter. The ALJ's February 21, 2006 remand order to the Coastal Marshlands Protection Committee (Committee) for further factual findings and expert agency analysis on two issues, though issued under the heading "Final Decision," was not, in substance, the Department's last word on whether it would grant or deny Point Peter, LLLP a marshlands permit,[6] and the sole narrow exception to OCGA § 50-13-19 (a)'s "final decision" rule is not applicable here. Thus, the superior court lacked subject matter jurisdiction to review the ALJ's order, and subject matter jurisdiction cannot be conferred by con-

---

[5] OCGA §§ 50-13-1 to 50-13-44.

[6] In deciding whether an agency action is a "final decision" subject to immediate judicial review, we look not to the title assigned to it by the agency, but instead to its substance and function. See *Hughey v. Gwinnett County*, 278 Ga. 740, 741 (609 SE2d 324) (2004) ("Whether an order is final and appealable is judged by its function and substance, rather than any 'magic language.' ").

sent, agreement, waiver, or acquiescence.[7] The Court of Appeals therefore erred in granting the discretionary application and addressing the parties' claims on the merits, and this Court should vacate the Court of Appeals' judgment with direction to remand to the Committee to conduct the additional information gathering and analytical tasks ordered by the ALJ.

Judicial review of agency action in a contested case is governed primarily by three provisions of the Georgia APA.[8] OCGA § 50-13-19 (a) authorizes superior court review of an agency's "final decision" in a contested case, and the review contemplated is "appellate in nature."[9] "A preliminary, procedural, or intermediate agency action or ruling is immediately reviewable" in superior court only "if review of the final agency decision would not provide an adequate remedy."[10]

Under the Coastal Marshlands Protection Act of 1970,[11] the Committee is subordinate to the Department in the permitting process,[12] and the Department acts only through the decisions of the ALJ.[13] By law, the Committee, as well as the ALJ, was required to determine, among other things, whether granting the permit requested by Point Peter would result in: (1) unreasonably harmful obstruction or alteration of the natural flow of navigational waters in the area; (2) unreasonably harmful or increased erosion, shoaling, or stagnation; or (3) unreasonable interference with the conservation of marine life, wildlife, or other resources.[14] The ALJ, acting for the Department, found that the Committee had failed to gather and analyze sufficient factual information to enable it to determine whether granting a marshlands permit to Point Peter would result in

---

[7] See, e.g., *Gray v. Gray*, 229 Ga. 460 (192 SE2d 334) (1972) ("Waiver or consent of the parties cannot confer on a court jurisdiction of a subject matter wherein it has none at law. When a court has before it a matter where it has no jurisdiction of the subject matter, no legal judgment can be rendered except one of dismissal; and when this court discovers from the record on appeal that a judgment has been rendered by a court having no jurisdiction of the subject matter, it will of its own motion reverse the judgment.").

[8] See OCGA §§ 50-13-19 (judicial review of contested cases), 50-13-20 (appeals to Court of Appeals or Supreme Court), 50-13-20.1 (judicial review of decisions in contested cases issued pursuant to Code Section 50-13-41).

[9] *Howell v. Harden*, 231 Ga. 594, 594 (203 SE2d 206) (1974). Accord *Ga. Pub. Svc. Comm. v. Southern Bell*, 254 Ga. 244, 246 (327 SE2d 726) (1985).

[10] OCGA § 50-13-19 (a).

[11] OCGA §§ 12-5-280 to 12-5-297.

[12] OCGA § 12-5-283 (a).

[13] OCGA § 12-5-283 (b) (providing that "[t]he decision of the administrative law judge shall constitute the final decision of the board" of the Department). See also OCGA § 12-1-2 (a) (stating that "[t]he decision of an administrative law judge shall constitute the final administrative decision in any matter" by the Department), (b) ("Any reference in this title to a final decision of the Board of [the Department of] Natural Resources shall mean a final administrative decision by an administrative law judge.").

[14] OCGA § 12-5-286 (g) (1)-(3).

unreasonable interference with conservation of marine life, wildlife, and other resources for two reasons.

First, the research submitted to the Committee on the impacts to marine life, wildlife, and other resources, as well as the measures necessary to mitigate those impacts to the point that granting the permit would not result in unreasonable interference with their conservation, was not yet final. Second, the Committee did not consider or analyze the impact on the marshlands' delicate ecosystem of funneling an additional 17-23 million gallons of polluted stormwater runoff directly into the marshlands from Point Peter's associated residential and commercial development every time there was a heavy rain. Accordingly, the ALJ remanded the matter back to the Committee to compile this information, decide what mitigation measures would be necessary to prevent unreasonable interference with conservation, and either deny the marshlands permit or grant it again, but this time with appropriate conditions.

Point Peter and the Committee have argued in the superior court, the Court of Appeals, and now this Court that the Department, acting through the ALJ, erred as a matter of law in directing the Committee to gather and analyze information on the effects of routinely channeling tens of millions of gallons of polluted runoff directly into the marshlands from the high land portions of the development. That may or may not be a correct view of the applicable law. Regardless, it does not transform the ALJ's intermediate decision that it needed more data to conduct the statutorily required public interest analysis into a "final decision" by the Department on whether, in the end, Point Peter's application for a marshlands permit would be granted or denied. In any event, as the Court of Appeals noted, none of the parties appealed the portion of the ALJ's order remanding to the Committee for further consideration of whether granting the permit would result in unreasonable interference with the conservation of right whales, manatees, and sea turtles.[15] Thus, no matter what this Court decides today, further proceedings before the Committee at the administrative level are inevitable.

Where an agency's final decision-maker (here, the ALJ) remands to an intermediate or initial agency decision-maker (here, the Committee) for further factual findings and analysis, review at the agency level is obviously not yet complete. The ALJ's February 21, 2006 order remanding to the Committee for further investigation and analysis was, by definition, an "intermediate agency action or

---

[15] *Coastal Marshlands Protection Committee v. Center for a Sustainable Coast*, 286 Ga. App. 518, 530 (649 SE2d 619) (2007).

ruling."[16] Accordingly, under the Georgia APA, the superior court had subject matter jurisdiction to review the order only if review of the eventual final decision by the agency "would not provide an adequate remedy."

We have consistently construed the "no[ ] . . . adequate remedy" language of OCGA § 50-13-19 (a) as creating an extremely narrow exception to the final decision rule for superior court review of contested cases. This position accords well with administrative law's strong preference for holding judicial review in abeyance until an administrative agency has spoken its last word in a case.[17] Thus, we have found that further proceedings at the agency level "would not provide an adequate remedy" only where the agency's rules affirmatively prohibited further proceedings following a remand order,[18] or where a remand order in essence dictated the agency's final decision on whether a permit would be granted or denied.[19] Otherwise, we have emphasized that "if [a party to a contested case] is dissatisfied after exhausting his administrative remedies, then (and only then) may he seek judicial review of the administrative determination."[20] As the United States Supreme Court has warned, "frequent and deliberate flouting of administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures."[21]

In this case, there is no reason to think that superior court review *after* the further fact-finding and analysis by the Committee ordered by the ALJ "would not provide an adequate remedy" as that phrase is used in OCGA § 50-13-19 (a). If, after further proceedings by the Committee and a final decision by the ALJ, the superior court

---

[16] See Black's Law Dictionary (4th ed. 2008) (defining remand as "[t]he act or an instance of sending something (such as a case, claim, or person) back for further action").

[17] See, e.g., *McKart v. United States*, 395 U. S. 185, 193-194 (89 SC 1657, 23 LE2d 194) (1969) ("A primary purpose is, of course, the avoidance of premature interruption of the administrative process. The agency, like a trial court, is created for the purpose of applying a statute in the first instance. Accordingly, it is normally desirable to let the agency develop the necessary factual background upon which decisions should be based. And since agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise. And of course it is generally more efficient for the administrative process to go forward without interruption than it is to permit the parties to seek aid from the courts at various intermediate stages. The very same reasons lie behind judicial rules sharply limiting interlocutory appeals.").

[18] *Wilson v. Ledbetter*, 260 Ga. 180, 182 (390 SE2d 846) (1990) (agency rules prohibited further hearings).

[19] *Hughey*, supra, 278 Ga. at 740-741 (order calling for "remand" was, in reality, final determination that permit must be denied).

[20] *Dept. of Transp. v. Gibson*, 251 Ga. 66, 69 (303 SE2d 19) (1983). See OCGA § 50-13-19 (a) (requiring exhaustion of "all administrative remedies available within the agency" as prerequisite to judicial review in superior court).

[21] *McKart*, 395 U. S. at 195.

found that the ALJ erred as a matter of law in ordering the Committee to consider the impact of polluted stormwater runoff from the associated high land development, the superior court could simply strike from the permit any conditions imposed as a result of that analysis. This is not a case where agency rules prohibited further proceedings following the entry of the ALJ's order or the remand order was, in effect, tantamount to a final decision that the permit should be denied. Accordingly, this case does not fall within the one narrow exception to the Georgia APA's "final decision" rule, and the trial court lacked subject matter jurisdiction over the petitions for review.

To summarize, the ALJ's February 21, 2006 remand order was not a "final decision" by the Department on Point Peter's permit application, and there is no indication that withholding judicial review until the agency had reached its final decision would have left Point Peter without an adequate legal remedy. Consequently, the trial court lacked subject matter jurisdiction to review the ALJ's order, there was no "final judgment" by the superior court for the Court of Appeals to review,[22] and the Court of Appeals erred in granting the discretionary application and issuing an opinion addressing the parties' claims on the merits. For the same reason, this Court should not rule on the merits of the case, but should vacate the Court of Appeals' judgment and remand for further proceedings before the Committee. Accordingly, I respectfully dissent.

I am authorized to state that Presiding Justice Hunstein joins in this dissent.

DECIDED NOVEMBER 17, 2008 —
RECONSIDERATION DENIED DECEMBER 16, 2008.

*Smith, Gambrell & Russell, Stephen E. O'Day, Michael J. Grode, Christopher K. DeScherer*, for appellants.

*King & Spalding, Patricia T. Barmeyer, John Fortuna, James A. Chamberlin, Jr., Thurbert E. Baker, Attorney General, Isaac Byrd, Deputy Attorney General, John E. Hennelly, Senior Assistant Attorney General, James D. Coots, Assistant Attorney General*, for appellees.

---

[22] OCGA § 50-13-20.

*Butler, Wooten & Fryhofer, Joel O. Wooten, Jr., Julie V. Mayfield,* amici curiae.