**THIRD DIVISION**
**ELLINGTON, P. J.,**
**BETHEL, J., and SENIOR APPELLATE JUDGE PHIPPS**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 1, 2018**

# In the Court of Appeals of Georgia

A18A0240.  C&M ENTERPRISES OF GEORGIA, LLC v.
WILLIAMS.

ELLINGTON, Presiding Judge.

In March 2016, Mark Williams, acting as the Commissioner of the Georgia Department of Natural Resources and the Chairman of the Coastal Marshlands Protection Committee, determined that a portion of a bulkhead on riverfront property in Bryan County owned by C&M Enterprises of Georgia, LLC, was illegally located in a protected estuarine area of marshlands within the Department's jurisdiction. Based on this determination, Williams issued an order directing C&M to remove the structure. C&M filed an appeal from the order to the Office of State Administrative Hearings, and both parties filed motions for summary determination.[1]  An

---

[1] See OCGA §§ 12-5-283 (b) (right of any person who is aggrieved or adversely affected by any order or action of the Coastal Marshlands Protection Committee to review

administrative law judge granted Williams' motion for summary determination and denied C&M's motion. C&M appealed to the superior court, which also affirmed.[2] We granted C&M's application for discretionary appeal, and it contends that Williams arbitrarily and capriciously failed to apply the agency's standard policy to determine the boundary between C&M's property and protected marshlands within the Department's jurisdiction.[3] For the reasons explained below, we affirm.

*Delineating a Jurisdictional Line.* By way of background, we note that the Coastal Marshlands Protection Act of 1970, OCGA §§ 12-5-280 through 12-5-297, was enacted to regulate structures and activities in Georgia's coastal marshlands "to

---

by an administrative law judge appointed by the Board of Natural Resources, upon petition within 30 days after the issuance of such order or the taking of such action); 50-13-20.1 and 50-13-41 (hearing in a contested administrative case that is not presided over by the agency head or board or body which is the ultimate decision maker to be conducted by an administrative law judge of the Office of State Administrative Hearings).

[2] See OCGA §§ 12-5-283 (b) (judicial review of an administrative law judge's decision in a contested case under the Coastal Marshlands Protection Act of 1970); 50-13-19 (judicial review of a final agency decision in a contested case under the Georgia Administrative Procedures Act, OCGA §§ 50-13-1 through 50-13-23, upon request within 30 days after the service of the final decision of the agency or, if a rehearing is requested, within 30 days after the decision thereon).

[3] See OCGA §§ 5-6-35 (a) (1) (application for discretionary appeal required to appeal from a decision of a state agency); 50-13-20 (review of a final judgment of the superior court under the under the Georgia Administrative Procedure Act).

ensure that the value and functions of the coastal marshlands are not impaired and to fulfill the responsibilities of each generation as public trustees of the coastal marshlands for succeeding generations." OCGA § 12-5-281. Marshlands include "any marshland intertidal area, mud flat, tidal water bottom, or salt marsh in the State of Georgia within the estuarine area of the state," whether tidewaters reach the area "through natural or artificial watercourses." OCGA § 12-5-282 (3). The Act provides:

> No person shall remove, fill, dredge, drain, or otherwise alter any marshlands or construct or locate any structure on or over marshlands in this state within the estuarine area thereof without first obtaining a permit from the committee or, in the case of minor alteration of marshlands, the commissioner.

OCGA § 12-5-286 (a) (1). See *Coastal Marshlands Protection Committee v. Altamaha Riverkeeper, Inc.*, 315 Ga. App. 510, 510-511 (726 SE2d 539) (2012) ("[A] party seeking to build a structure over any marshland in Georgia must first obtain a permit from the Committee.") (citation omitted).

The Act provides that the Department of Natural Resources has the authority, inter alia, "to determine jurisdiction under [the Act]." OCGA § 12-5-284 (a) (1). See *Center for a Sustainable Coast v. Coastal Marshlands Protection Comm.*, 284 Ga. 736, 741 (2) (670 SE2d 429) (2008). The Department tasks its Coastal Resources Division ("CRD") with marking the boundary lines of marshlands within the

3

jurisdiction of the Department for permitting and enforcement under the Act. A CRD staff member marks a jurisdictional boundary line, known as a "JD line," onsite with flagging tape and/or numbered flags staked into the ground to delineate the boundary between marshlands within the estuarine area (subject to regulation under the Act) and uplands (not regulated under the Act).[4] Drawing a JD line is not an exact science, and these lines often are not straight because they track the contours of the marshlands-uplands interface.

A marked JD line allows a property owner to see whether any proposed construction will encroach on marshlands, that is, whether the activity will alter the marshlands or place a structure on the area seaward of the JD line. If the proposed activity is occurring entirely landward of the JD line, no permit will be required. Conversely, if the proposed activity will encroach on jurisdictional marshlands, a permit from CRD will be required.

If the landowner seeks a permit from CRD for activity that will encroach on jurisdictional marshlands, the landowner is required to submit a survey prepared by a registered surveyor that shows the JD line delineated by CRD staff. Once CRD approves a survey containing a delineated JD line, the line becomes the "JD line of

---

[4] These facts, drawn from the record, are undisputed unless otherwise noted.

4

record" and remains in effect for one year or throughout a permit approval process, unless CRD delineates a revised JD line based on new information that the previously flagged JD line of record is no longer correct.

If CRD learns that a landowner who did not first obtain a permit is possibly violating the Act by filling, dredging, or otherwise altering any marshlands or building a structure over any marshlands, CRD first checks whether there is a JD line of record for the property. If there is a JD line of record, it will be used in any enforcement action. If there is not a JD line of record for the property, CRD will delineate a JD line as it would in the permitting context, that is, the JD line should be established according to the conditions that existed before the unauthorized activity. Depending on the nature and extent of construction occurring before a CRD enforcement site visit, it may not be possible based on the usual indicators for CRD to determine the JD line precisely as it would have been before the landowner disturbed the land. In such a case, CRD will rely on other field-based evidence to determine the JD line at the time of the unauthorized activity. According to Karl Burgess, who was then the Program Manager for CRD's Marsh and Shore Management Program, such field-based evidence may include examining core samples or digging for buried plants. According to Stuart Sligh, an environmental

consultant working for C&M, DNR may also consider historical photographs and GPS-based mapping surveys.

*C&M's First Replacement Bulkhead on the Sallette Tract*. In February 2008, C&M acquired a 3.84 acre parcel known as "the Sallette Tract" along the bank of the Ogeechee River. At the time, there was a concrete boat ramp and a wooden bulkhead along the riverbank. In April 2008, without seeking a permit under the Act, C&M removed the boat ramp on the western side of the property, removed the eastern portion of the former wooden bulkhead, and excavated uplands approximately eight to ten feet inland from the riverbank on the eastern portion of the property. C&M then began construction of a concrete bulkhead to replace the wooden bulkhead. CRD received a report of this activity, and CRD staff conducted a site visit on April 15, 2008. At that time, there was no JD line of record in CRD's files delineating the marshlands for the Sallette Tract. CRD staff delineated a JD line and flagged the property on April 17, 2008. The JD line flagged by CRD was generally a straight line, except in the area of the former boat ramp where the line made a jog inland around the former location of the boat ramp, such that the area where the boat ramp had been was included in jurisdictional (protected) waters. CRD determined that footers for the new bulkhead had been installed in the marsh and that marshlands were being

6

dredged and filled without authorization from CRD. CRD issued a cease-and-desist letter and a Notice of Violation to Timothy Marshlick, the sole member and owner of C&M, requested a time line for removing the unauthorized structures, and scheduled an enforcement conference for the following week.

In November 2008, CRD issued a second Notice of Violation. The notice stated that CRD would remark the April 2008 JD line and directed C&M to have its surveyor re-stake the April 2008 JD line, to submit a survey showing the JD line based on the stakes, and to provide a written plan for removing the unauthorized structures. The notice expressly advised C&M that if it wished to fill in the old boat ramp and close its seaward entrance with a bulkhead, a permit would be required. C&M filed the survey as directed. After several weeks of negotiations between the parties, C&M agreed to remove the replacement bulkhead and restore the affected water bottoms, and the parties entered into a consent agreement in January 2009. CRD confirmed C&M's compliance with the consent order in a letter dated March 10, 2009.

*C&M's Second Replacement Bulkhead on the Sallette Tract*. In March 2009, C&M, without first requesting that CRD re-delineate the marshlands boundary, began construction of a second replacement bulkhead. C&M excavated uplands even further

inland by approximately five feet from the excavation for the first replacement bulkhead. C&M obtained a United States Army Corps of Engineers nationwide permit for a bank stabilization and boat dock construction project. In conjunction with the federal permit, on April 3, 2009, C&M requested a corresponding revocable license for the project from CRD.[5] C&M represented to both agencies that the new bulkhead would be built outside jurisdictional marshlands and would follow the April 2008 JD line established by CRD in connection with the earlier enforcement proceedings. The plans showed that the proposed bulkhead would jog around the landward end of the previously excavated boat ramp, that is, that it would not close the seaward entrance of the old boat ramp. CRD granted the revocable license based on this plan.

In February 2010, CRD conducted a site visit and discovered that the completed second replacement bulkhead did not comply with the federal permit and the revocable state license. Specifically, CRD determined that the second bulkhead did not follow the April 2008 JD line, where it jogged around the landward end of the previously excavated boat ramp, but instead was built in a straight line and that fill had been placed in a depression left by the removal of the old boat ramp. In March

---

[5] See OCGA § 12-5-286.

8

2010, CRD sent C&M a Notice of Violation and a cease-and-desist order, directing C&M to cease any construction related to the second bulkhead. C&M did not request a hearing before an ALJ or hearing officer at that time but did stop construction. In May 2010, CRD revoked C&M's license to build the bulkhead and boat dock.

In June 2010, C&M submitted an application for an after-the-fact permit for the second replacement bulkhead. In its application, C&M acknowledged that the second bulkhead encroached to a small extent on jurisdictional area and attached drawings showing the "DNR Jurisdiction Line," that being the line as delineated in April 2008 that jogged around the area of the former boat ramp. C&M requested, "[g]iven the minor amount of existing jurisdictional impact as compared to the amount of possible environmental harm resulting from demolition and complete removal of the bulkhead," that much of the second bulkhead be allowed to remain as built. C&M proposed that it ameliorate the effects of the incursion by removing the part of the bulkhead from the area where the boat ramp had been excavated and removing the fill dirt from that area, which would allow it to receive the ebb and flow of the tide and thus reconnect that area to jurisdictional waters. Days before a hearing on the permit application scheduled for August 27, 2010, C&M withdrew its application.

9

In negotiations with CRD to resolve the matter, which dragged on for years, C&M took the position that the April 2008 JD line had been incorrectly delineated in the earlier enforcement proceedings and should have been based on historical conditions that existed before it disturbed the property in removing the old wooden bulkhead and concrete boat ramp. Ultimately, CRD rejected C&M's argument, and, on March 21, 2016, Williams issued an administrative order requiring C&M to remove the portion of the second bulkhead located in jurisdictional marshlands. C&M filed an appeal from the order to the Office of State Administrative Hearings; an ALJ affirmed the order. The ALJ determined that "the operative point in time for determining the existence of marshland with regard to [C&M's] second unauthorized bulkhead was at the time [C&M] began constructing it (i.e., March 2009), not at some point in time before [C&M] began constructing its first unauthorized bulkhead, which was discovered in April 2008." C&M appealed to the superior court, which also affirmed. C&M's appeal is now before this Court.

1. As a threshold matter, we consider Williams' contention that C&M failed to exhaust its administrative remedies with the result that it lacked the right to appeal the March 2016 order. Williams contends that C&M could have appealed the March 2010 cease-and-desist order if it believed that the delineation of the April 2008 JD

10

line, on which the order was based, was invalid.[6] Because C&M failed to do so, Williams contends, it cannot challenge the March 2016 order that was based on the same JD line.

A person cannot seek judicial review of an agency action unless he "has exhausted all administrative remedies available within the agency." OCGA § 50-13-19 (a). "Long-standing Georgia law requires that a party aggrieved by a state agency's decision must raise all issues before that agency and exhaust available administrative remedies before seeking any judicial review of the agency's decision." (Citation and punctuation omitted.) *Dept. of Community Health v. Ga. Soc. of Ambulatory Surgery Centers*, 290 Ga. 628, 629 (724 SE2d 386) (2012).[7]

The record shows that Williams filed a motion to dismiss C&M's appeal to the superior court based on the alleged failure to exhaust its administrative remedies. The superior court, however, did not rule on the motion and ruled only on the merits of C&M's arguments. Because Williams did not obtain a ruling on the motion to dismiss

---

[6] OCGA § 12-5-291 (a) (1) (Any cease-and-desist order issued by the Coastal Marshlands Protection Committee to a person who is altering marshlands in violation of the Act "becomes final unless the person named therein requests in writing a hearing before a hearing officer appointed by the [Board of Natural Resources] no later than ten days after the issuance of such order.").

[7] See fn. 1, supra.

and did not file a cross-appeal, this issue is not preserved for appellate review. See

*Ga. Bd. of Dentistry v. Brooks*, 273 Ga. 852, 853 (1) (548 SE2d 284) (2001); cf.

*Northeast Ga. Cancer Care, LLC v. Blue Cross & Blue Shield of Ga., Inc.*, 297 Ga.

App. 28, 32 (1) (676 SE2d 428) (2009).

Moreover, the record shows that the March 2010 cease-and-order directed

C&M to cease any construction related to the second bulkhead but did not order the

bulkhead's removal. Over the next six years, C&M tried to secure permission to leave

the second replacement bulkhead, or at least most of it, where it was. Within thirty

days after the March 2016 order, which for the first time directed C&M to remove the

second replacement bulkhead and backfill according to the April 2008 JD line, C&M

filed a petition for a hearing before an ALJ pursuant to OCGA § 12-5-283 (b). C&M

also appealed the ALJ's adverse order, which is the final agency decision,[8] to the

superior court pursuant to OCGA §§ 50-13-19 and 50-13-20.1.[9] This is not a case

where a party tried to sidestep available administrative procedures by filing a petition

_____

[8] Under OCGA § 12-5-283 (b), when a person who is aggrieved or adversely affected by any order or action of the Coastal Marshlands Protection Committee exercises the right to a hearing before an administrative law judge appointed by the Board of Natural Resources, "the decision of the administrative law judge shall constitute the final decision of the board."

[9] See fn. 1 and 2, supra.

12

for declaratory judgment in the superior court. See *Ga. Soc. of Ambulatory Surgery Centers v. Ga. Dept. of Community Health*, 316 Ga. App. 433, 435 (729 SE2d 565) (2012) ("When an adequate administrative remedy exists that has not been taken, dismissal of any declaratory judgment or equitable action is appropriate.") (citation and punctuation omitted).

C&M's appeal to this Court is not barred by a failure to exhaust administrative remedies.

2. Next, we consider Williams' contention that C&M waived any objection to the April 2008 JD line with the result that C&M lacked the right to appeal the ALJ's decision.[10]

---

[10] Williams argues that

> C&M actively participated in the April 2008 JD line becoming the JD line of record (resulting in its subsequent use in this enforcement action) by not asking CRD to re-mark the line, as it had offered to do [in November 2008], and instead submitting a survey with that line delineated, leading to its validation as the line of record. Moreover, C&M does not dispute that it failed to challenge the [March 2010] cease-and-desist order applying the JD line to the [second replacement] bulkhead or that it submitted two applications to CRD [in April 2009 and June 2010] based on the JD line. Either of these acts would be sufficient, standing alone, to establish waiver.

The ALJ agreed that C&M had, "in fact, waived any objection to the April 2008 JD line."

13

Waiver is the voluntary relinquishment of a known right and may be established by express statements or implied by conduct. An implied waiver is one shown by a party's decisive, unequivocal conduct reasonably inferring the intent to waive. Ordinarily, silence is insufficient to establish a waiver unless there is an obligation to speak.

(Punctuation and footnotes omitted.) *Kennestone Hosp. v. Hopson*, 273 Ga. 145, 148-149 (538 SE2d 742) (2000). "In cases of silence there must be not only the *right* but the *duty* to speak before failure to do so becomes an estoppel." (Citation omitted; emphasis in original.) *Tybrisa Co. v. Tybeeland*, 220 Ga. 442, 445 (139 SE2d 302) (1964). "[I]n general, estoppels are not favored by the law." (Citation omitted.) *McKean v. GGNSC Atlanta, LLC*, 329 Ga. App. 507, 514 (3) (765 SE2d 681) (2014). "While normally the question of waiver is a matter for the jury, where . . . the facts and circumstances essential to the waiver issue are clearly established waiver becomes a question of law." (Citation and punctuation omitted.) *St. Mary's Hosp. of Athens, Inc. v. Cohen*, 216 Ga. App. 761, 763 (1) (456 SE2d 79) (1995).

The record shows that C&M began building the second replacement bulkhead in March 2009, and the bulkhead was complete when the Department first discovered it in February 2010. C&M's conduct is consistent with the sworn statements of C&M's sole owner and member, Timothy Marshlick, that he never believed that the

14

April 2008 JD line was the applicable boundary, either in relation to the first replacement bulkhead or the second bulkhead and that he believed that all of C&M's construction was landward of the marshlands-uplands interface. And C&M's conduct is consistent with Marshlick's statement that he tried to secure permission to leave the second replacement bulkhead where it was through various avenues, by obtaining a bank stabilization and boat dock construction project permit, by filing an application for an after-the-fact permit, and by arguing for a re-delineation of the boundary based on the conditions that existed before the excavation of the old wooden bulkhead and boat ramp. Even if some of C&M's representations in connection with these activities may be considered admissions against interest as a matter of evidentiary law,[11] the

---

[11] OCGA § 24-8-801 (d) (2) provides, in part:

Admissions shall not be excluded by the hearsay rule. An admission is a statement offered against a party which is:

(A) The party's own statement, in either an individual or representative capacity; . . .
(C) A statement by a person authorized by the party to make a statement concerning the subject; . . . [or]
(D) A statement by the party's agent or employee, . . . concerning a matter within the scope of the agency or employment, made during the existence of the relationship[.]

See former OCGA § 24-3-36 (2012) ("Acquiescence or silence, when the circumstances require an answer, a denial, or other conduct, may amount to an admission.").

15

lack of decisive, unequivocal conduct reasonably demonstrating C&M's intent to waive the right to keep the second replacement bulkhead precludes a finding of waiver such as would entirely bar consideration of C&M's appeal on the merits.

3. C&M contends that the method that Williams used to determine the jurisdictional line between uplands and protected marshlands was an arbitrary and capricious departure from agency policy for defining jurisdictional lines and was otherwise contrary to law.

Under OCGA § 50-13-19, which governs judicial review of contested administrative decisions, "[j]udicial review of an administrative decision requires the court to determine [whether] the findings of fact are supported by any evidence and to examine the soundness of the conclusions of law that are based upon the findings of fact." (Citation and punctuation omitted.) *Pruitt Corp. v. Ga. Dept. of Community Health*, 284 Ga. 158, 160 (3) (664 SE2d 223) (2008). The reviewing court "accepts the [agency's] findings of fact if there is any evidence to support the findings," but the court may "reverse or modify [an] agency decision . . . upon a determination that the agency's application of the law to the facts is erroneous." (Citations omitted.) Id. at 161 (3). A reviewing court is expressly prohibited from substituting its own judgment for that of the agency as to the weight of the evidence on questions of fact.

16

OCGA § 50-13-19 (h). Upon judicial review, reversal is not warranted unless the substantial rights of the appealing party have been prejudiced in one of five ways expressly delineated in OCGA § 50-13-19 (h) (1) through (5) or, as argued in this case, when the agency decision was "[a]rbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." OCGA § 50-13-19 (h) (6).[12]

---

[12] OCGA § 50-13-19 (h) provides that a court reviewing an agency decision

shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

See *Welcker v. Ga. Bd. of Examiners of Psychologists*, 340 Ga. App. 853, 855 (1) (798 SE2d 368) (2017) ("If a party alleges that an agency's ruling was arbitrary and capricious, the courts must determine whether a rational basis exists for the final administrative decision made. This is a question of law.") (punctuation omitted); *Northeast Ga. Med. Ctr., Inc. v. Winder HMA, Inc.*, 303 Ga. App. 50, 58 (2) (b) (693 SE2d 110) (2010) ("Arbitrary" means "fixed or done capriciously or at pleasure; without adequate determining principle; not founded in the nature of things; non-rational; not done or acting according to reason

In addition, "[w]hen an administrative agency decision is the subject of judicial review, judicial deference is to be afforded the agency's interpretation of statutes it is charged with enforcing or administering and the agency's interpretation of rules and regulations it has enacted to fulfill the function given it by the legislative branch." (Citations omitted.) *Pruitt Corp. v. Ga. Dept. of Community Health*, 284 Ga. at 160 (2).[13] Furthermore, the appellate court's duty is not to review whether the

or judgment; depending on the will alone; absolutely in power; capriciously; tyrannical; despotic.") (citation and punctuation omitted); *Sawyer v. Reheis*, 213 Ga. App. 727, 730 (2) (445 SE2d 837) (1994) (Where the record demonstrates that the ALJ had a rational basis for his or her ultimate determination, the reviewing courts are not authorized to substitute their own judgment for that of the ALJ under the theory that the administrative determination is arbitrary and capricious.); *Ga. Power Co. v. Ga. Pub. Svc. Comm.*, 196 Ga. App. 572, 580 (5) (396 SE2d 562) (1990) (Arbitrary and capricious decisions are "those having no rational basis[.] . . . The opinions of competent experts may constitute such a rational basis.") (citations and punctuation omitted).

[13] As we have explained:

Agencies provide a high level of expertise and an opportunity for specialization unavailable in the judicial or legislative branches. They are able to use these skills, along with the policy mandate and discretion entrusted to them by the legislature, to make rules and enforce them in fashioning solutions to very complex problems. Thus, their decisions are not to be taken lightly or minimized by the judiciary. Review overbroad in scope would have the effect of substituting the judgment of a judge or jury for that of the agency, thereby nullifying the benefits of legislative delegation to a specialized body.

(Citation and punctuation omitted.) *Ga. Dept. of Community Health v. Medders*, 292 Ga.

18

record supports the superior court's decision but whether the record supports the final decision of the administrative agency, which, in this case, is the decision of the ALJ. *Emory University v. Levitas*, 260 Ga. 894, 898 (1) (401 SE2d 691) (1994); *Williams v. Butler*, 322 Ga. App. 220, 222 (744 SE2d 396) (2013); *Professional Standards Commission v. Valentine*, 269 Ga. App. 309, 312 (603 SE2d 792) (2004); OCGA § 12-5-283 (b).

(a) In this case, C&M contends that CRD's policy with regard to defining the jurisdictional borders of marshlands is to delineate the boundary as it existed immediately before unauthorized action was taken to alter any marshlands or locate any structure over marshlands. Williams does not dispute this premise; indeed, it is the foundation of the March 2016 removal order and the ALJ's decision. The crux of this dispute is whether under this policy the jurisdictional boundary relevant to these enforcement proceedings is where the marshlands-uplands interface was before C&M

---

App. 439, 440-441 (664 SE2d 832) (2008). See also *Center For a Sustainable Coast v. Coastal Marshlands Protection Comm.*, 284 Ga. at 741 (2) ("Ordinarily, the interpretation of a statute by an administrative agency which has the duty of enforcing or administering it is to be given great weight and deference." The appellate court will "defer to an agency's interpretation when it reflects the meaning of the statute and comports with legislative intent." This deference is particularly warranted [in marshlands jurisdiction cases] because, in crafting the [Act], the General Assembly specifically stated that the Department of Natural Resources is authorized to determine jurisdiction under the [Act].") (citations and punctuation omitted).

19

first disturbed the riverbank in April 2008 (as C&M contends) or where it was immediately before C&M's construction activities in March 2009 (as the ALJ found). In support of this argument, C&M contends that the mean high tide line, which is the basis of the Department's jurisdiction, "is deemed to move (only) as a result of natural erosion or accretion" and that "tidal boundary lines are not altered by human activity" such as dredging or filling. Based on this, C&M contends that CRD erred in basing the JD line on the reach of tidewaters *after* C&M's demolition and excavation activities rather than on historical conditions before such activities altered the natural boundary. C&M contends that if the second replacement bulkhead were judged according to a pre-April 2008 boundary, it would be entirely outside of jurisdictional marshlands and not in violation of the Act.

As the ALJ found, the unauthorized action at issue in the March 2016 removal order is C&M's construction of the second replacement bulkhead beginning in March 2009. The evidence authorized the ALJ to find that the destruction of the old wooden bulkhead and concrete boat ramp and the construction of the first replacement bulkhead in April 2008 was a separate course of conduct from the construction of the second replacement bulkhead beginning in March 2009. C&M's violations of the Act in April 2008 were addressed in the first enforcement proceedings, resolved by

20

agreement, and concluded no later than March 2009, when CRD certified C&M's compliance with the consent order. We conclude that the ALJ did not act arbitrarily or capriciously and did not abuse or exceed its discretion in ruling that the jurisdictional boundary relevant to these enforcement proceedings is the marshlands boundary as it existed immediately before C&M's began its unpermitted construction of the second replacement bulkhead in March 2009.[14]

---

[14] Although the parties identified no Georgia cases directly on point, cases interpreting analogous federal law support this interpretation. See *United States v. Malibu Beach, Inc.*, 711 FSupp. 1301, 1311 (III) (A) (1) (a) (D.N.J. 1989) (In an action for an injunction against fill activities at a beach site, whether a pool was within the jurisdictional waters of the United States was to be based on whether the pool was subject to the ebb and flow of the tide at the time of the fill activities.); *Track 12, Inc. v. U.S. Army Corps of Engineers*, 618 FSupp. 448 (D. Minn. 1985) (The Corps had jurisdiction over a tract of land even though the land was not a natural wetland but was an artificial wetland resulting from the construction of a highway and a storm sewage system by state and local authorities.); *United States v. Ciampitti*, 583 FSupp. 483, 491-494 (D.N.J. 1984) (The history of a site, including the fact that part of the area may have become wetlands because of a man-made connection between the site and tidal waterways, is not relevant to the government's jurisdiction unless it indicates that the land was not wetlands at the time the government claimed jurisdiction, in that case, when the fill activity began. "[F]ederal jurisdiction is determined by whether the site is presently wetlands and not by how it came to be wetlands."); *United States v. Bradshaw*, 541 FSupp. 880, 883 (II) (D. Md. 1981) (Although there was evidence that the area where a landowner was dumping demolition debris and sand had been highlands before the government dug mosquito ditches, the determination of a violation was based on the condition of the area as wetlands at the time of the dumping.)

Furthermore, C&M's broad contention that tidal boundary lines are not altered by human activity is not warranted. The Department, which is charged with determining jurisdiction under the Act, has interpreted the Act to mean that, if the contours of land are changed by human activities, resulting in the movement of tidewaters into an area that was previously uplands, then any marshlands that result from such artificial watercourse constitutes jurisdictional marshlands. See OCGA § 12-5-282 (3) (marshlands are defined by whether an area is reached by tidewaters "whether or not the tidewaters reach the littoral areas through natural or artificial watercourses").[15] Indeed, C&M concedes that its 2008 excavation of the riverbank created additional tide-influenced areas.[16] It follows that, immediately before C&M

---

[15] Again, analogous federal law supports this interpretation. See cases cited in fn. 14. Moreover, it is consistent with the purposes of the Act to treat manmade *creation* of coastal marshlands differently from manmade *destruction* of marshlands. A landowner who illegally places fill in an area to the extent that tidewaters no longer reach the area should not be rewarded with a seaward shift of the jurisdictional boundary that takes the area out of the Department's jurisdiction. But if human activity allows tidewaters to reach a new area, depending on the circumstances, a landward shift of the boundary may be rightfully recognized.

[16] According to CRD's Karl Burgess, C&M's removal of the first replacement bulkhead likely resulted in an expansion of the marshlands into parts of C&M's property that, before the removal of the old wooden bulkhead and boat ramp, would have been considered uplands. In its appellant brief, C&M itself states that its demolition and dredging activities in April 2008, in removing the old wooden bulkhead and concrete boat ramp and building the first concrete replacement bulkhead, altered the reach of the tide

built the second replacement bulkhead, additional jurisdictional marshlands subject to protection under the Act existed compared to C&M's preferred historical boundary line. At no point does C&M point to any evidence, that, if CRD had delineated a JD line according to the contours of the land in March 2009, then the second replacement bulkhead would have been entirely landward of that line.

(b) We note that C&M also argues that CRD violated agency policy when it delineated the April 2008 JD line, which it deems "the dispositive issue." But this argument is a red herring. As discussed in Division 3 (a), supra, the ALJ correctly ruled that the dispositive issue is whether the second bulkhead violated the Act when judged based on the marshlands-uplands interface as it existed immediately before C&M began constructing that bulkhead in March 2009. Pretermitting whether the ALJ erred in ruling that the April 2008 JD line was the JD line of record for the second replacement bulkhead, such error would present no basis for reversal. The record shows that CRD considered using the April 2008 JD line in connection with the second replacement bulkhead to be an accommodation to C&M because its activities in connection with the first replacement bulkhead allowed the interface to shift landward. Because the second replacement bulkhead was in violation of the Act

inland by eight to ten feet. This is supported by the testimony of C&M's consultant, Sligh.

23

whether judged by the April 2008 JD line, even if wrongly delineated, or by a new line that CRD would have drawn based on March 2009 conditions, it does not matter whether the April 2008 JD line was completely accurate when delineated.

In light of the great weight and deference to be accorded to the Department's interpretation of the Act in terms of the operative point in time for determining the Department's jurisdiction over marshlands with regard to dredging, construction, and other activities that may alter the marshlands-uplands interface, and because it is undisputed that the second replacement bulkhead, when judged according to the boundary of the marshlands as it existed immediately before C&M began constructing the bulkhead in March 2009, encroached on jurisdictional marshlands, the March 2016 removal order had a rational basis and must be affirmed.

*Judgment affirmed. Bethel, J., and Senior Appellate Judge Herbert E. Phipps concur.*